BEATRICE TWOMBLY *v.* LOUIS N. PIETTE.

February Term, 1926.

Present:   WATSON, C. J., POWERS, TAYLOR, SLACK and BUTLER, JJ.

Opinion filed October 6, 1926.

*Poisons—Prescriptions—G. L. 6282-6284—Effect of Revisions of Statute on Law Relating to Physician's Prescriptions—Instructions to Jury—Future Damages—Specific Mention of One Class as Excluding Those Not Mentioned—Duty of Excepting Party to Show Error Affirmatively—Irresponsive Answer—Objection to Evidence Without Specifying Grounds—Cross-Examination—Medical Expert—Harmless Error—Exclusion of Question Assuming Fact Not in Evidence.*

1.  Act of qualified practitioner of medicine in telephoning pharmacist and directing him to send certain drug to patient, *held* to constitute prescription, and consequently, under provisions of G. L. 6284, to relieve pharmacist from ascertaining and recording use to be made of drug, as required by G. L. 6282.

2.  Where language and punctuation of original enactment (Acts 1904, No. 143, § 13, as amended by Acts, 1906, No. 176, § 4) requiring pharmacists to record certain information as to sale of certain specified poisonous drugs, made plan that such requirement did not apply to physician's prescriptions or recipes, and there is nothing to show that subsequent alteration in revisions was intended to make any alteration in law, none should be regarded.

3.  Requests to charge that there was no evidence as to certain ail-

ments being the result of application of bichloride of mercury by physician's patient on his prescription, *held* properly refused.

4. Request to charge that plaintiff had no permanent heart trouble for which she could recover and that her heart trouble had ceased, *held* properly refused, there being evidence to the contrary.

5. Where court specifically instructed jury as to what elements of future damage plaintiff might recover, and did not include future heart trouble therein, latter was excluded under maxim that express mention of one thing implies exclusion of another.

7. Answer of medical expert to question on cross-examination that he did not think certain conditions specified in hypothetical question were considered to be effects of constitutional poisoning by bichloride of mercury, *held* not responsive to question whether he could give any light on matter about which he was being cross-examined, and properly stricken out.

8. Where no ground of objection is stated, an exception to the admission of evidence is unavailing, unless it appears that such evidence was wholly irrelevant and immaterial.

9. In action of tort by patient against physician for injuries from application to scalp of bichloride of mercury prescription, where evidence showed that patient while suffering pain therefrom came to physician's office for treatment, and was directed by him to go home and wash her hair, cross-examination of defendant as to whether if he had desired he "could have cleaned that condition up immediately," *held* not irrelevant and immaterial.

10. In such action, cross-examination of defendant, as to whether he knew if bichloride of mercury remained on plaintiff's scalp any length of time longer, greater absorption would take place, *held* within plaintiff's right of proper cross-examination to test defendant's capacity as an expert.

11. In such action, cross-examination of defendant as to his knowledge of sale of corrosive sublimate by druggists, *held* harmless, in view of his answer, "not very much."

12. In such action, cross-examination of defendant as to whether he knew about druggists sending corrosive sublimate to patients and customers or about their using it in that community for any purpose, *held* harmless in view of his answers to the effect that he had no knowledge concerning it.

13. In such action, where pharmacist as witness for plaintiff testified on direct examination that he had been directed by defendant by telephone to send his patient one ounce of bichloride of mercury, exclusion on cross-examination of question as to whether during his experience as a druggist witness had ever known of a physician prescribing such an amount for human use, *held* without error, there being no evidence that witness had knowledge that drug was intended for human use.

ACTION OF TORT against a physician for malpractice. Plea, general issue. Trial by jury at the September Term, 1925, Orleans County, *Moulton*, J., presiding. Verdict and judgment for the plaintiff. The defendant excepted. The opinion states the case. *Affirmed.*

*J. W. Redmond* for the defendant.

*W. W. Reirden, E. A. Cook,* and *D. E. Porter* for the plaintiff.

STATEMENT BY CHIEF JUSTICE WATSON. The plaintiff's evidence tended to show that on July 3, 1924, in the forepart of the afternoon, her mother, Mrs. Nettie S. Twombly, with whom plaintiff was then living at Newport Center, telephoned to the defendant, Dr. Piette of Newport, who it appeared was a practicing physician and surgeon, telling him that her daughter, the plaintiff, had had mosquito bites on her head and accidentally combed through them so they were causing her trouble with keeping her hair in curl, and water come from them, and asking him if he could send something to put on to heal and stop them; that in answer thereto defendant said he could, said he would send a white powder over on the 5 o'clock train to be used, further telling Mrs. Twombly to get the moisture off those places, those spots, and just dip the ends of the fingers in the powder and put it on those places; that some powder was received upon the arrival of the train, and some was applied to at least three of those places on plaintiff's scalp as directed by the defendant; that as soon as the powder was so applied, it burned plaintiff's head, causing her to exclaim "It burns my head so I cannot stand it." That directly after the powder was put on plaintiff's head, Mrs. Twombly called up defendant by telephone and

told him the powder was burning plaintiff's head so she could hardly bear it, and asked him if it should act like that. To this question defendant answered that "It shouldn't burn," and asked what kind of a looking powder it was, and if it was white. On being told that it was a white powder, defendant said he did not understand why it should be like that—that he had telephoned the druggist to send it.

That the powder sent by the druggist to Mrs. Twombly under the direction of the defendant was what is known as bichloride of mercury, or (under another name) corrosive sublimate, and that the same was received by the plaintiff and used on her head for the purpose and in the manner above described, conclusively appeared from the evidence.

The evidence of the defendant tended to show that bichloride of mercury is a poison, and is corrosive, that is, it will corrode, burn tissue, and is not a proper thing to prescribe to be applied to anyone's scalp; that there is another drug which is known as and called "mild chloride of mercury," popularly called "calomel." That this latter drug is considered not a poison when applied externally, and is very much prescribed for external applications and so used, in the shape of powder, by physicians generally, in skin affections. Defendant testified that in the afternoon of July 3, 1924, he received a telephonic communication from Mrs. Twombly of Newport Center, saying that her daughter had some trouble with her scalp, some mosquito bites which had started to ooze, making the hair wet, and asked him if he wouldn't send her out something by the mail; that defendant, deciding from the description given by Mrs. Twombly that the trouble with the daughter was not mosquito bites, but was what is known as impetigo, told her that he would order the Bigelow Pharmacy (of Newport) to send out some mild chloride of mercury, and told her it would be a white powder and she should apply it by dipping the fingers into the powder and apply it to the scalp after the scalp had been dried; that defendant then called up the Bigelow Pharmacy by telephone, and Mr. Slafter, one of the partners and a registered pharmacist, answered; that defendant then asked Mr. Slafter if he would send out to Mrs. Twombly, in Newport Center, "one ounce of mild chloride of mercury," to which Slafter answered yes, that he would; that the next thing he knew about the matter was in the early evening, when he received another telephone call from Mrs. Twombly

saying that the medicine she had received burned the daughter's scalp; that defendant told her it should not, saying "There must be something wrong somewhere—better send the girl out to see me," and the girl was sent out; that when the girl came defendant saw that her hair was all wet and that there was an abundant supply of powder in the hair, and he thought some crystals, and the scalp was very red, showing irritation; that defendant told them he thought there was a mistake made, etc.

In rebuttal, the pharmacist Slafter was called as a witness by the plaintiff and testified that on July 3, 1924, he was told by defendant over the telephone, to send "one ounce of bichloride of mercury" to Mrs. Twombly at Newport Center, and that it was sent on the train leaving Newport about 5 o'clock; that it was wrapped up in a piece of paper with a sublimate label around it, and that in turn, placed inside of a paste-board box with a label on the box, was done up and mailed; that the witness, when defendant told him by telephone to send that bichloride of mercury, made an entry of the order as soon as possible on a record book kept at the drug store, in which a record was made of poisons of certain nature there sold. The record book was put in evidence and showed under date of July 2 (should have been July 3), 1924, "Mrs. Twombly, Newport Center. Who for? Ditto marks, amount, one ounce, drug, Hg Cl-2. Ordered by Dr. Piette. Sold by Slafter." The letters and figure, "Hg Cl-2," is the chemical formula for "bichloride of mercury."

Mrs. Twombly testified in rebuttal that at the time she talked with defendant in the afternoon of July 3, 1924, he did not tell her that he would order Bigelow's Pharmacy to send out a powder or some medicine to be used on the plaintiff's head; that he did not say anything to her about any drug store sending her anything.

In the course of the trial it was conceded on behalf of the defendant that if he prescribed bichloride of mercury to be applied to plaintiff's scalp he was guilty of gross negligence. But the question remained whether he in fact prescribed that substance.

The verdict was in favor of the plaintiff, and the case is for review on defendant's exceptions.

WATSON, C. J.   The question whether defendant ordered the pharmacist to send ·to Mrs. Twombly "bichloride of mercury," or whether it was "mild chloride of mercury," was submitted to the jury in a manner satisfactory to the defendant, the jury being told in that connection that if defendant told the druggist to send "mild chloride of mercury" and the druggist, through mistake, sent "bichloride of mercury," then the defendant was not responsible for the negligence or fault of the druggist and their verdict must be for the defendant.   The court further instructed the jury in effect that, it being conceded on behalf of the defendant that if he prescribed "bichloride of mercury" to be used on plaintiff's scalp he was guilty of negligence as a physician, that in directing the druggist to send "bichloride of mercury" to Mrs. Twombly, if defendant did so direct, this was a prescription of it and, if that was the proximate cause of the injuries suffered by the plaintiff, she was entitled to recover in this action.

Under the foregoing instructions, to which no exception was taken, the jury must have found that defendant's order to the pharmacist was to send "bichloride of mercury," for they returned a verdict for the plaintiff.

This brings us to the consideration of the question of proximate cause.   Defendant's fourth request, to charge was:   "If you find that Dr. Piette ordered Slafter (pharmacist) to send Mrs. Twombly 'bichloride of mercury,' it is admitted that, in the circumstances, such ordering was gross negligence on the part of Dr. Piette; but, if you also find that, if Slafter had, as the law required him, ascertained the proposed use·of the ordered drug, he would not have sent the 'bichloride of mercury,' then, notwithstanding the said negligence of Dr. Piette, the sole proximate cause of the sending of the 'bichloride of mercury,' was the negligence of Slafter, and Dr. Piette cannot be held liable therefor."

G. L. 6282 relates to regulation of the sale of certain specified poisonous drugs, including "corrosive sublimate," and keeping a record of such sales.   Among other things, this section provides as follows:   "When a sale is made by anyone of any of such drugs, * * *, such sale shall be entered and recorded in a book kept for that purpose, giving the name of the article sold, date of sale, to whom sold, residence of purchaser, for whom purchased, the use to be made of the article or drug purchased and the name of the salesman or clerk making such sale."

At the time when, by defendant's direction, the bichloride of mercury was sent to Mrs. Twombly by pharmacist Slafter, the latter made such a record of the sale, complete with the single exception that it did not state the use to be made of the drug. Instead of the record stating the use, it contains the words "ordered by Dr. Piette." The witness Slafter testified that he did not find out the proposed use to be made of the drug; that if he had known it was to be used on the scalp of a human being, he never would have sent it. In this connection defendant contends that the original wrong on his part in prescribing bichloride of mercury became injurous to the plaintiff only because of the subsequent intervening negligent act of Slafter in sending it without ascertaining its proposed use, and that this negligence of the latter became the immediate and proximate cause of the sending of it and its subsequent injurious application, and the previous negligence of the defendant became a remote cause. Many authorities are cited which it is claimed support this contention, one being Cooley on Torts (pp. 70-71) where it states as follows: "If the original wrong only becomes injurious in consequence of the intervention of some distinct wrongful act or omission by another, the injury shall be imputed to the last wrong as the proximate cause, and not to that which is more remote." The claimed distinct wrongful act or omission of another asserted by the defendant to have intervened, was the failure of Slafter to ascertain the use to be made of the drug before sending it to Mrs. Twombly, and the theory on which was based the fourth request to charge was that such was the requirement of the provision of G. L. 6282, quoted above. By G. L. 6283, a person who violates a provision of the preceding section is penalized. But by the next section (G. L. 6284), "The provisions of the two preceding sections shall not apply to legally qualified practitioners of medicine or to their prescriptions or recipes to their patients."

[1] The ruling of the trial court, rightly made we think, without any exception thereto saved, that defendant's act in calling up the druggist and directing him to send a certain drug to Mrs. Twombly was a prescription of it, established the law of the case in such respect. And it was a prescription by the defendant, a legally qualified practitioner of medicine, to his patient, the plaintiff. It therefore falls within the provisions of section

6284, and consequently the provisions of the two preceding sections have no application thereto.

It is argued by defendant, however, that the construction above given to section 6284 is not the one intended it should have. It is further urged that the Legislature knew, and this Court will take judicial knowledge, that physicians in the State, in the regular course of their practice, sell to their patients (1) drugs, and (2) "prescriptions" or "recipes," and so, manifestly, that section merely excepts from the operation of section 6282 those sales by physicians to their patients; that the meaning of the former section is not to exclude from the operation of the latter section, (1) sales of specified drugs by physicians, and (2) sales by druggists made in filling prescriptions of physicians to their patients, because section 6284 "does not say that, nor anything like" it; that it does not say "nor to the filling of their prescriptions or recipes," the language being "or to their prescriptions or recipes to their patients," which language, it is urged, taken in connection with the preceding part of the sentence, shows clearly that the sentence is dealing only with the relation of physicians directly with their patients.

But the foregoing argument loses its force when the statute to which it relates is subjected to the rules of construction applicable thereto. Section 6282 was first enacted as section 13 of No. 143, Laws of 1904, and read: "Every apothecary, druggist, or other person who sells any arsenic, corrosive sublimate, * * * shall make a record of such sale in a book kept for that purpose, specifying the kind and quantity of the article sold, and the time when, and the name of the person to whom such sale was made, * * *." Section 14 of that Act is substantially like G. L. 6283. Section 15 of that Act reads: "The two preceding sections shall not apply to legally qualified practitioners of medicine, nor to their prescriptions or recipes to their patients."

By section 4 of No. 176, Acts of 1906, section 13 of No. 143, Acts of 1904, quoted above, was amended by including additional articles of drugs there named, and by inserting a provision that the record shall be made "at the time of such sale." In all other respects the law of said section remained substantially as before, and became P. S. 5485 in the revision of 1906, and section 14 of No. 143, Acts of 1904, became P. S. 5486, and section 15 of said Act became P. S. 5487, it being changed in that revision to read: "The provisions of the two preceding sections shall not apply to

legally qualified practitioners of medicine nor to their prescriptions or recipes to their patients." It should be noticed here that in said revision the comma after the word "medicine" was dropped. Reference will be made again later to the dropping of this comma.

By section 1 of No. 161, Acts of 1908, section 5485 of the Public Statutes was amended to read as in that act, and, as so amended, it became in the revision of 1917, without any change in substance, G. L. 6282.

[2] Beyond question the provisions of that section, requiring a record to be made of sales of any of the drugs specified therein, is of general application, except as is provided otherwise by G. L. 6284. We have already noticed that, as first enacted, the law of that section contained a comma immediately following the word "medicine," and that the comma remained there until the revision of 1906, in which it was dropped. It has also appeared that, as first enacted, there was in the law of that section, immediately following said comma, the word "nor," which word so there continued until the dropping of the comma, and thereafter it remained in the same place in the law, but without the comma before it, until the revision of 1917, in which the word "nor" was omitted and the word "or" was substituted therefor, and so substituted the latter word appears in G. L. 6284. The language and punctuation of the original enactment in this respect make plain that the proper interpretation of the law is as we have given it above, and there being nothing clearly showing that either alteration in the revisions, by way of omitting the comma or in using the word "or" instead of "nor," was intended to make any alteration in the law, none should be regarded. *Clark* v. *Powell,* 62 Vt. 442, 20 Atl. 597; *Brighton* v. *Kelsey,* 77 Vt. 258, 59 Atl. 833; *Stearns* v. *Graham,* 83 Vt. 111, 74 Atl. 486; *Bigelow, Admr.* v. *St. Johnsbury,* 92 Vt. 423, 105 Atl. 34.

As a necessary sequence of what we have said, the request (fourth) under consideration contained an erroneous statement as to the requirements of Slafter by law, for which reason, if for no other, it was properly refused.

[3] Defendant's fifth request to charge was to the effect that there was no evidence tending to show that the nervous trouble which plaintiff testified to having had in the summer of 1924, while teaching school, was the result of the application of the bichloride of mercury to her scalp, nor of any negligence of defendant, and

so the jury could not consider that nervousness in assessing damages. And defendant's ninth request was to the effect that there was no evidence that plaintiff's dizziness while riding, resulted from such application, nor from any negligence of defendant, and so such dizziness must be excluded by the jury in assessing damages. It is unnecessary to recite or state in detail the evidence bearing on the two questions thus presented. The careful examination which we have given the record in these respects convinces us that there was no error in refusing both requests.

[4-6] Defendant's tenth request to the effect that there was no evidence that any heart trouble wherewith plaintiff was then (at time of trial) affected, resulted from the application of bichloride of mercury to her scalp, nor from any negligence of defendant, and so the jury should not consider such heart trouble in assessing damages. In the same connection defendant excepted to the failure of the court to charge that plaintiff had no permanent heart trouble for which she could recover,—that her heart trouble had ceased; and excepted also to the failure to instruct that she could not recover for any heart trouble that she might thereafter experience, because there was no evidence tending to show that she would experience such. These three exceptions are considered together in defendant's brief, and we dispose of them together. To this request, what we have said in disposing of the fifth and ninth requests is equally applicable and need not be repeated. The court could not well charge that plaintiff's heart trouble had ceased, for there was evidence to the contrary. As to whether she could recover damages for such future trouble was quite another question. The court specifically instructed the jury as to what elements of future damages she might recover. Future heart trouble was not included therein. It was therefore in effect excluded under the maxim that the express mention of one thing implies the exclusion of another, and if defendant claims that such damages were erroneously included in the general verdict and so reversible error, it devolves upon him to make it affirmatively so to appear, which he has not done. *Hill* v. *Bedell*, 98 Vt. 82, 126 Atl. 493; *Chatfield* v. *Morgan*, 99 Vt. 337, 131 Atl. 845.

[7] Dr. Somers, called by defendant as an expert witness, testified in direct examination as follows: "Q. Suppose, doctor, that a patient had mosquito bites of the scalp so that they were painful, or some other eruption of the scalp, of the skin, and that

bichloride of mercury in a box like this—this very box—was taken by an attendant and she dips her fingers in the box in the way that I do (illustrating), and, parting the hair with the other ·hand, applies that to the mosquito bites as I put my finger there, —and does that 5 times: In your opinion would there be applied, in that manner, sufficient bichloride of mercury to give any constitutional effects? A. I don't think so." Then in cross-examination the following occurred: "Q. Assuming that, as a result of this application to the head, to open breaks in the skin on the head, the patient had sores on the arms, sores on the neck, sores on the nose, a swollen throat, sore gums, you would call that all constitutional affection, would you? A. Some of the things I wouldn't expect to be. Q. You wouldn't expect some of these things to happen, but you never knew of a case where it was applied? A. I never heard of its happening. Q. You never heard of its happening? A. No. Q. So you can't give us any light on that? A. I don't think the things you have mentioned —not all of them—are considered to be the effects of constitutional poisoning by bichloride of mercury." Objection was here made by plaintiff because "the witness did not answer the question." The court thereupon ordered the answer stricken out, to which defendant excepted, claiming that the answer was responsive. The question asked the witness as a fact whether he could give any light on the matter about which he was being cross-examined. Instead of answering the question asked him, he proceeded to give an expert opinion outside the question and not called for. There was no error in the ruling. *Vaillancourt v. Grand Trunk Ry. Co.,* 82 Vt. 416, 74 Atl. 99.

[8, 9] It appeared from the testimony in chief of defendant that after the application of the bichloride of mercury to the plaintiff's scalp and while she was suffering intense pain therefrom, she came to his office in Newport to see him concerning it, and that after she left there defendant went to her home in Newport Center to see her, but she had not returned home. In cross-examination he was asked and answered as follows: "Q. How long had the girl been away from your office before you arrived at Newport Center? A. I can't remember the exact time, but approximately she left the office shortly after seven, and I arrived at Newport Center about half past eight. Q. So that for an hour and a half you knew that she was suffering intensely as a result of bichloride poisoning? A. I did not know

it because I suspected that she had gone home and washed her hair as directed. It would not have taken her, if they drove an automobile, as they did, but a few minutes to travel 6 miles. Q. It would take longer than it would have taken to go to your bathroom? A. Yes, I think it would. Q. If you had cared to you could have cleaned that condition up immediately?'' This last question was objected to, and to its admission exception was saved, but no ground stated. The witness answered: ''Miss Twombly was carrying on so that I felt that it was better to have her sent home where her mother could take care of her than it would be for a man to take her up to his bathroom and wash her hair out.'' We cannot say that the evidence to the admission of which exception was here taken, was wholly irrelevant and immaterial. Consequently the exception is without avail. *Vermont Box Co.* v. *Hanks*, 92 Vt. 92, 102 Atl. 91; *Niles* v. *Danforth*, 97 Vt. 88, 122 Atl. 498.

[10] Immediately following the foregoing and referring to the same matter, defendant further testified in cross-examination, subject to same objection and exception, that he knew the longer the bichloride of mercury stayed on plaintiff's scalp the more it would be absorbed into the circulation, but the absorption was slow; that (subject to same objection and exception) if the skin is intact it takes longer than if the skin is not intact; it doesn't take very long; that if the skin is broken and that stuff is applied, it begins to irritate immediately; that when the plaintiff arrived in defendant's office, he found the broken places in the skin were red, and absorption was already taking place to some extent. ''Q. And you knew that if that remained there any length of time longer, greater absorption would take place?'' The same objection being made, the court ruled that it was cross-examination, and allowed it, saving an exception to defendant. Defendant testified in his examination in chief as an expert, in effect, that when, at his office, he saw the bichloride of mercury on plaintiff's head, he ''told her that she'd better go right home and wash that out with a large amount of water—take lots of pains to have lots of water to wash that out, and I told her that, because it is readily soluble in water, and by using a large amount of water, it would get it away from the hair and the scalp as easy as any way I knew of. And then I gave her a tube of ointment to apply to the scalp to sooth the irritation.''

The questions to which the foregoing exceptions were taken,

were well within plaintiff's right of proper cross-examination, to test the defendant's capacity as an expert. *Titus* v. *Gage,* 70 Vt. 13, 39 Atl. 246; *Barney's Admx.* v. *Quaker Oats Co.,* 85 Vt. 372, 82 Atl. 113.

[11, 12] Defendant was further asked in cross-examination what he knew about the sale of corrosive sublimate by druggists, to which he answered "Not very much." This was allowed subject to exception, but as the answer is harmless to defendant, we do not consider the exception further. Defendant was also asked, subject to exception, whether he knew about their sending it out to patients and customers. His answer was in the negative. Also asked whether he knew "about their using it in that community for any purpose." He answered "I presume they do." Other similar questions were asked regarding defendant's knowledge of the sale of it by druggists and answered subject to exception; but as the answers were all to the effect that he had no knowledge concerning it, and so were harmless to defendant, by reason of which, as in the previous instance, the exceptions are not further considered.

[13] As before seen, Slafter, the druggist, called by the plaintiff as a common witness, testified in chief that defendant, by telephone, ordered him to send to Mrs. Twombly one ounce of bichloride of mercury. In cross-examination he was asked whether he ever, during all years of his experience as a druggist, knew of a physician's prescribing an ounce of bichloride of mercury for any human use. On objection being made, defendant offered to show the negative of the question proposed. The offer was excluded and exception saved. There was no error in the ruling.

We have already observed that Slafter was not called upon by law to made a record of the sale of bichloride of mercury made by him in filling the prescription of defendant to the plaintiff, his patient. There was no evidence in the case showing that at that time he (Slafter) had any knowledge as to the use intended to be made of the drug so sold, or that it was intended for *any human use.* On the contrary, the undisputed evidence was, in effect, that at the time of filling the prescription he had no such knowledge. It is claimed that the offered evidence tended to render less probable the direct testimony of the witness that he understood defendant to order bichloride of mercury, and so its exclusion was prejudicial error. How this might be had the witness filled the prescription with knowledge that the drug so

sold was for any use with respect to the human body, we do not say, for certain it is that without such knowledge at that time the offered evidence could have had no such tendency.

*Judgment affirmed.*

At the hearing of this case TAYLOR, J., sat, but by reason of his death, he took no part in the decision of the case.