FRED V. PERKINS *v.* VERMONT HYDRO-ELECTRIC CORPORATION.

October Term, 1933.

Present: POWERS, C. J., SLACK, MOULTON, THOMPSON, and SHERBURNE, JJ.

Opinion filed October 2, 1934.

368

370

372

374

*Fenton, Wing, Morse & Jeffords* for the defendant.

*Warren R. Austin, Austin & Edmunds,* and *Ernest E. Moore* for the plaintiff.

MOULTON, J. During the flood of 1927 the plaintiff's property, in the village of Cavendish, was destroyed by the waters of the Black River. He has brought this action to recover for his injury of which he claims the negligence of the defendant

in the manner in which it constructed a conduit diverting the waters of School House Brook, and in the construction of an inadequate dike along the side of its pond in the river, about 1,000 feet from plaintiff's premises, was a cooperative and producing cause. The flood itself is conceded to have been of such unprecedented dimensions and destructive character that it was an act of God. The defendant is a corporation engaged in the business of generating and selling electric power, and, at the time in question, maintained a dam, pond and power house at Cavendish.

At the village of Cavendish the Black River flows in an easterly direction and turns sharply to the north, passing through a narrow defile known as Cavendish Gorge. Just at the turn, and at the entrance to the gorge was the defendant's dam and pond. The village lies to the north and west of the river, Main Street, on the easterly side of which the plaintiff's house was situated, being roughly parallel to the river and turning to the northeast as the river entered the gorge. Between the street and the gorge there was a ridge, called in the record the Hogback or the Kame ridge, which at some distance northerly of the plaintiff's premises turned to the northwest, the highway passing through it by means of a cut. Beyond the highway the ridge appears to be known as School House hill. A brook, called "School House Brook," flowed from the northeast, and at one time crossed Main Street by means of a culvert and then, turning to the south and passing through the plaintiff's land east of his house and between it and the Hogback, emptied into the defendant's pond. About a year before the events in issue, in pursuance to an agreement between the plaintiff and certain other property owners and the defendant, the latter diverted the course of the brook to the northeast by means of a system of Toncan iron pipes or conduits. A 48-inch pipe, laid under ground received the water of the stream at an intake, equipped with gratings, at a point northwest of the street, and passing under and along it, conducted the water to a concrete catch basin, situated on the easterly side of the road beyond the Hogback. Another pipe 24 inches in diameter, for the purpose of taking the surface water, was laid from a point in the rear of the plaintiff's premises, along the original course of the brook, until it joined the course of the 48-inch pipe, from which point it was laid in the same trench, but underneath the larger pipe,

until both pipes reached the catch basin. From the basin, a 36-inch pipe extended to an open ditch, through a swamp, the water being finally discharged into the Black River below the gorge. At the lower end of the 36-inch pipe, where it reached the open ditch, there was a concrete anchor. At the point where the brook originally joined the pond a dike was erected, the details of which will be described later. The general situation and the location of the various landmarks may be seen in the subjoined plan, plaintiff's Exhibit 1,* introduced at the trial without objection. The plaintiff's house is the one marked 10 thereon.

During the afternoon and evening of November 3, 1928, the waters of School House Brook and Black River, swollen by a long continued rain of great intensity, overflowed their banks. The diversion system washed away, the soil about it having been eroded by the action of the water, and a trough or ditch was thus formed from the highway easterly to the outlet of the 36-inch pipe. The flood water filled the low land lying easterly of Main Street and westerly of the hogback, and having risen above the level of the highway where it passed through the hogback, flowed to the east along the line of the erosion, thus creating a current the action of which undermined and swept away the plaintiff's house and property. It is the plaintiff's claim that the negligent construction of the diversion system caused the erosion along the line of the pipe which, in turn, created a sluice way through which the water rushed with great velocity; and that the dike was built at a height below the level of previously known high water in the Black River.

At the close of the plaintiff's case, and again at the close of all the evidence, the defendant moved for a directed verdict. The motion was overruled and an exception taken. This is the first question for our consideration. The motion is based upon twenty distinct grounds, but it is not necessary to recite them, because they will all receive attention in the following opinion.

The law governing the determination of the issues presented by this exception is well settled. Where damages suffered are due, directly and exclusively, to natural causes, without human intervention, which could not have been prevented by any amount of foresight, pains, and care reasonably to be ex-

---

* See next page.

1. POST OFFICE
2. HOTEL ELLIOT.
3. DUTTON HOMESTEAD
4. PERKINS' STORE
5. BAPTIST CHURCH
6. STONE CHURCH
7. C. BEMIS PLACE
8. WHITE "
9. STEARNS "
10. GOODRICH "
11. STONE HOUSE
12. WARD PLACE [TONY'S]
13. SPERRY "
14. SCHOOL HOUSE
15. WARFIELD(MINCH) PL
16. FULLER (WHITCOMB) "
17. GEN. DAVIS "

Hawkes Mountain is
at the right of Gorge.

**THE CAVENDISH FLOOD AREA**

(shaded portion)

PLFF's Ex. 1.

pected, there is no liability because it is an act of God. But, if the damages are not due exclusively to such natural causes, in other words, if the negligence of the one sought to be charged mingles with the operation of the natural causes, the injury is not, in a legal sense, the act of God. So if the injury which the flood occasioned might have been avoided or prevented by human prudence, foresight, pains, and care reasonably to be expected from the defendant, but not exercised, there is liability. · *Town of Bennington* v. *Fillmore & Slade,* 98 Vt. 405, 421, 130 Atl. 137; *Porter Screen Mfg. Co.* v. *Central Vermont Ry. Co.,* 92 Vt. 1, 11, 102 Atl. 44; *Eagan* v. *Central Vermont Ry. Co.,* 81 Vt. 141, 145, 69 Atl. 732, 16 L. R. A. (N. S.) 928, 130 A. S. R. 1031; *Zeno's Bakery* v. *State of Vermont,* 105 Vt. 370, 166 Atl. 379, 382. The negligence of the defendant must, however, be an active and cooperating cause of the damage. *Bennington* v. *Fillmore & Slade, supra,* page 423 of 98 Vt., 130 Atl. 137; *Porter Screen Mfg. Co.* v. *Central Vermont Ry. Co., supra.* "The mere existence of negligence which is not a producing cause of the injury produces no liability." *Helbling* v. *Alleghany Cemetery Co.,* 201 Pa. 171, 174, 50 Atl. 970. It must not be "a merely fanciful or speculative or microscopic negligence which may not have been in the least degree the cause of the injury." *Baltimore & O. R. R. Co.* v. *School District,* 96 Pa. 65, 70, 42 A. R. 529; *Kenney* v. *Kansas City, P. & G. R. R. Co.,* 74 Mo. App. 301, 308. So, if the act of God is so overwhelming as of its own force to produce the injury independently of the negligence· of the defendant, the latter cannot be held responsible. *Helbling* v. *Alleghany Cemetery Co., supra; City of Piqua* v. *Morris,* 98 Ohio St. 42, 49, 120 N. E. 300, 7 A. L. R. 129; *James* v. *Kansas City P. & G. R. R. Co.,* 69 Mo. App. 431, 439, 440; 1 Shearman and Redfield on Negligence (6th ed.), par. 39.

■ The principle involved is simply that of causation. Except where there are joint tort-feasors, "a defendant's tort cannot be considered the legal cause of plaintiff's damage, if that damage would have occurred just the same even· though defendant's tort had never been committed." Prof. Jeremiah Smith, "Legal Cause in Actions of Tort," 25 Harv. Law Rev. 303, 312; id. 103, 109. In an article entitled "Multiple Causation and Damage," by Chief Justice Peaslee, of New Hampshire, 47 Harv. Law Rev. 1127, the learned author points out that where

two causes concur in producing damage, one innocent (as, for example, the operation of natural forces) and the other guilty (as, the doing of a negligent act), and each is of itself sufficient to work the injury without the concurrence of the other, there should be no liability. ''So long as the innocent cause is in actual, inescapable operation, before the wrongful act becomes sufficient, it is not apparent how the latter can be considered the cause of the loss. Causation is matter of fact, and that which is in fact causal ought to be deemed so in law'' (page 1130). The point is illustrated in *Sowles* v. *Moore*, 65 Vt. 322, 26 Atl. 629, 21 L. R. A. 723, wherein it appeared that the defendant negligently omitted to erect guards around a hole in the ice on Lake Champlain. The plaintiff's team of horses, having taken fright, became unmanageable, ran away, plunged into the opening, and were drowned. The presiding judge submitted to the jury the questions whether the horses would not have run into the opening, if it had been properly guarded, and whether the guards, if there, would have stopped the team considering their fright and speed, and charged that if the guards would not have prevented the casualty, the plaintiff could not recover, even though he was in the exercise of due care and the defendant was negligent. It was held that the instructions were ''fully sustained both by reason and authority.'' All this, however, is only stating in other words the rule that, in order to justify a recovery, the defendant's negligence must form, what is usually called a proximate cause, but which may more accurately be termed an efficient and producing cause of the injury.

On the question whether there was negligence, it is material to consider the consequences that a prudent man might reasonably have anticipated, but, when negligence is once established, the consideration of the anticipated consequences of the act or omission is wholly immaterial in the determination of the extent of the liability imposed by it. If one is negligent, he is liable for all the injurious consequences that flow from his negligence, until diverted by the intervention of some efficient cause which makes the injury its own, or until the force set in motion by the negligent act or omission has so far spent itself as to be too small for the law's notice. *Woodcock's Admr.* v. *Hallock*, 98 Vt. 284, 290, 127 Atl. 380, and cases cited. The defendant cannot, of course, be held to a reasonable anticipation of an unprecedented flood, but if the diversion system were improperly

constructed so that the defendant might reasonably have foreseen that erosion would thereby result in times of usual or known high water, or if the dike were insufficient to confine the Black River during such times, there would be negligence, and the fact that the defendant did not foresee that this shortage of duty would, in concurrence and cooperation with an unprecedented flood, become a producing cause of the particular injury would not relieve it from liability. It is liable for such results as flowed directly from its' negligence whether they were to be reasonably anticipated or not. *Isham* v. *Dow's Estate,* 70 Vt. 588, 590, 41 Atl. 585, 45 L. R. A. 87, 67 A. S. R. 691; *Gilson* v. *Delaware & H. Canal Co.,* 65 Vt. 213, 220, 26 Atl. 70, 36 A. S. R. 802. "It is not necessary that injury in the precise form suffered should have been foreseen; it is only essential that, viewing the occurrence in retrospect, the consequences appear to flow in unbroken sequence from the negligence." *Hatch* v. *Globe Laundry Co.,* 132 Me. 379, 171 Atl. 387, 389.

The defects in the diversion system, as claimed by the plaintiff were as follows: (1) A construction of the open ditch at the outlet of the pipe line; (2) raising the outlet above the bottom, or thread, of the valley and making the 36-inch pipe slab the hill instead of following the thread of the valley, thus creating a fall at the outlet instead of a slope for the discharge; (3) inadequate construction of the anchor at the outlet of the 36-inch pipe, where it discharged into the open ditch; (4) failure to shape the bottom of the trench to receive the 36-inch pipe, and to tamp and puddle the backfill around and over it; (5) failure to shape the bottom of the trench for the 24-inch pipe and the backfill over the 24-inch pipe to receive the 48-inch pipe; (6) failure to tamp and puddle the backfill of the 24-inch and 48-inch pipes, and the use, in such backfill of frozen chunks of earth, and chunks of sidewalk, and permitting waterways along and outside of the pipe line to remain after notice of their existence; and (7) construction of inadequate collars, and quicksand.

We proceed to consider the evidence bearing upon these issues, to discover whether, taken in the light most favorable for the plaintiff, it fairly and reasonably tended to support the claims made in his behalf. Owing to the length of the transcript in this cause, it is impracticable to compress a statement of all the details of the testimony within the reasonable limits of an opinion; but the parties may rest assured that the record

and briefs have been carefully examined and all the circumstances relied upon by each of them have been given consideration in arriving at the result. For convenience, the claims of the plaintiff are not taken up in the order stated.

*WATERWAYS.*

■ Two wells near the trench prepared for the reception of the 24-inch pipe went dry during the process of excavation, and remained dry after the pipe was laid and the trench filled up. The defendant claims that the well water drained to a lower stratum or to bed rock, and did not flow into the trench. But the plaintiff's evidence tended to show that, as the wells lowered, water was seen coming into the trench through the side on which the wells were situated. Water was observed running in the trench on the side of the pipe and in the bottom. This indicated, according to the experts called by the plaintiff, that the well water had gone out in a water course, that the excavation had, by puncturing the impervious layer, provided an outlet and lowered the level of the ground water; and that the situation called for special care that the backfill of the trench should be made firm and impervious in order to prevent the ground water from finding an outlet along the pipe through the trench. The defendant's engineer, in charge of the work, noticed the condition in the wells and, in order to prevent the existence of waterways along and outside of the pipe line and to turn the water back into the wells, three concrete collars were placed around the 24-inch pipe. They were about 1 foot thick and 5 or 6 feet high, extending to the sides of the ditch, about two feet below the pipe and one foot over it. But, according to an expert called by the plaintiff, in order to be effective, these collars should have been placed against an impervious material. The defendant introduced evidence tending to show that they were grounded upon hardpan, but there was other evidence to the effect that the 24-inch pipe was laid through quicksand, or water-bearing gravel, and that at one point, when a workman struck his pick into the gravel, the water bubbled up as from an artesian well. Another testified that when he used his shovel it sank over the blade as far as the handle. Beyond the point where the 24-inch pipe met the 48-inch pipe, and was laid in the same ditch, and underneath it, the backfill over the smaller pipe was just enough to cover it and constituted

the foundation for the larger pipe. The collars, according to an expert, might have the effect of increasing the tendency of water to flow along the upper pipe by preventing it from proceeding along the lower one. The slope of the foundation of the 48-inch pipe was greater than that of the 24-inch pipe and thus more velocity would be imparted to water flowing along it. At any rate, the empty wells did not fill up, and, after the drainage system was completed, there were indications that there was water in the ditches. One witness testified that she observed water coming out of the pipes at the catch-basin at a time when no water was going into them at their respective intakes, thus affording an inference that there was water in the soil or ditches outside the pipes which was getting into them at the joints. Another witness, who assisted in putting bands around the joints of the 48-inch pipe testified that they were not made watertight, although the specifications called for watertight joints, and the bands could have been so tightened. The plaintiff, on several occasions, saw water trickling out around and underneath the header at the outlet of the 36-inch pipe. A workman, engaged in clearing out the catch-basin after a heavy shower which had damaged the 36-inch pipe, saw water running out on both sides of both the 24- and 48-inch pipes, which had not then been installed for their entire lengths. Other testimony was given to the same general effect. Further evidence was given by several who observed the situation at various times during November 3, 1927, and who testified to having seen water coming out at the sides of and around the pipes, and to other indications of streams along the pipes causing depressions or holes in the surface into which water was flowing. This indicated, according to the plaintiff's experts, the existence of an underground stream of water. Certainly there was evidence which would justify the jury in finding that the concrete collars were inadequate for the purpose for which they were intended, and from the testimony of persons concerned in the installation that this condition was known, or ought to have been known, to the defendant. There was evidence tending to show that the joints in the 48-inch pipe were not tight. An inspection during installation showed that they were not as tight as they ought to be, and caulking was done with patching cement, but it was not known whether they were water proof, because there was no

water in them at the time. This in connection with the other testimony above mentioned made a question for the jury.

It is strongly urged that the concrete catch basin, into which the 24-inch and 48-inch pipes emptied, made it impossible for any waterways to exist along the 36-inch pipe which led from it. The basin was cement concrete, 8 feet in height, 5 feet square inside, 8 feet square outside at the top, and about 11 feet, 6 inches square outside at the base. At the base the walls were 3 feet, 3 inches thick, and at the top 18 inches. The weight was $67\frac{6}{10}$ tons. The 36-inch pipe was firmly set in the cement. But one of plaintiff's witnesses testified that about 3 p.m. on November 3, he saw water flowing along both sides of the pipe, and the earth falling off, at a time when, as she observed, by looking into the catch basin, the 36-inch pipe was not flowing more than half full. The inference here is that the catch basin did not operate to prevent the existence of the waterways along the 36-inch pipe.

The plaintiff introduced evidence of an occurrence during the construction of the pipe line, in mid-November, 1926. At the time the 36-inch pipe had been laid and backfilled. The 48-inch and 24-inch were partly laid. The catch basin, except the bottom of it, had not been poured, and the anchor at the outlet of the 36-inch pipe had not been constructed. The excavation for the catch-basin had been made and a wooden V-shaped trough had been placed across the excavation connecting the 24-inch and 36-inch pipes. A severe storm came up with the result that the 36-inch pipe was damaged. The three sections nearest the catch-basin were undermined, one of them being caused to protrude above the ground. The part of the trench through which these sections extended was eroded and washed out to a depth of 2 or 3 feet under the pipe and the walls of the trench as well, for a distance of a foot on each side. The backfill of the entire trench was partly washed away. The trench was filled into the proper depths and the pipe realigned and relaid. The defendant insists that the damage was apparently done by the water flowing over the surface of the ground, while the plaintiff claims that it gave rise to the inference that there were waterways in the trench allowed to be there by faulty construction, and that the fact of the washout was notice to the defendant of the existence of such waterways, and that proper care should have been taken to avoid them in the relaying of the pipe.

386

There was evidence tending to show that, when the washout took place, and before the anchor was installed, water courses were seen on the outside of the pipe at the place where the anchor was to be put, and that there were indications here that the earth under the pipe had become washed out. But the evidence further tended to show that the entire pipe was not relaid and that the new backfill was not tamped. It cannot be said that the occurrence of the washout was not without some probative force, and that the inference, claimed by the plaintiff, was unwarranted, in view of the evidence.

## PUDDLING.

The plaintiff's evidence tended to show that the backfill in the trenches was not puddled, so that it would, when it became dry, be firm and compact. This operation is ordinarily performed by directing a stream of water from a hose into the excavation while the material is being thrown in, so that the earth becomes impregnated and a sort of porridge and settles or compacts of its own accord. The defendant introduced evidence to the effect that in a certain portion of the trench prepared for the 24-inch pipe the soil was wet and mucky and of a soupy consistency, and that the backfill itself was very wet, so that artificial puddling was not necessary. But this evidence did not apply to the 48-inch pipe, or to the 24-inch pipe in other parts of its length, or to the 36-inch pipe, which extended from the outlet of the catch basin. The evidence on the part of the plaintiff applied generally to all of the diversion system.

## TAMPING.

So too, whether the backfill was properly tamped, or tamped at all, was a question for the jury. The plaintiff's witnesses, some of whom had been employed in the work, testified that there was no attempt to firm the earth, and to force it around and under the pipe so as to fill up the voids, and that the earth was simply thrown in with shovels. Good practice, according to witnesses called by the plaintiff, required that the fill should be tamped firmly in place, the filling of the ditch being made in 6-inch layers, free from large stones, sods, or other material which could not be thoroughly compacted, and that each layer should then be tamped thoroughly around and over the pipe. The defendant's evidence tended to show that this procedure

was not applicable to this kind of a trench, which was 18 feet deep, and that the great lateral pressure on the sides of the ditch, and the downward pressure of the backfill would have the effect of compacting the material, and that there was tamping with shovels, and that the workmen walked over the loose earth as it was thrown. It is further pointed out that during the year after the pipe was installed there were only two instances of settlement of the surface each 3 or 4 inches deep and that this indicated that the work had been thoroughly done, and the backfill had compacted. But this goes no further than to show that the evidence was conflicting, and that the jury would be at liberty to take either view.

*BACKFILL.*

The evidence on the part of the plaintiff tended to show that the backfill of both pipes was partly composed of frozen material. Several witnesses testified to this, among them laborers employed in the work. According to them chunks a cubic foot in size were thrown directly upon the pipes, stricking with a metallic sound, and remaining solid. A booklet of directions for the installation of Toncan metal conduits, introduced as an exhibit, contained a warning against such procedure. Some of the chunks were as large as a man's body and were rolled in with bars. A concrete sidewalk was broken up and the fragments, some of which weighed 100 pounds, and were over 2 feet long, were thrown into the trench, upon the pipe which was there covered by 3 or 4 inches of dirt. In the words of one witness, "The chunks went in; everything went in, we didn't do any sorting." The effect would be to leave voids under the overhanging level of the pipes and in the fill, and when thrown directly upon the pipe, the frozen masses might lodge between it and wall of the pipe and leave quite a space underneath. This would create a very pervious condition, and would necessarily create a passage for the flowage of water. The defendant introduced a schedule showing the minimum daily temperature during the period of construction from October to November 15, 1926, from which it appeared that while upon 25 days, the temperature was below freezing, on only 4 was it below 20 degrees F., and on many days the maximum temperature was 40 degrees or over, and that whatever frozen material was used was simply the crust which had formed over the excavated earth

Hence, it is argued, there is an extreme improbability of any material freezing of the soil. But the testimony of the plaintiff's witness clearly made the use, and the extent of, the frozen material, a question for the jury. The defendant urges also that whatever frozen material was put in the trench thawed out during the following summer and by the fall of 1927, the backfill would have become completely consolidated. But, in view of the testimony as to waterways existing in the open trench, and what appeared after the trench was completed, it was still a question of fact whether these streams continually flowing did not keep an open channel along or under the pipes, in spite of the settling of the earth composing the backfill. Of course it appears fairly evident that the fragments of sidewalk would not disintegrate and combine with the pliable material.

## ANCHOR AND OUTLET DITCH.

The 36-inch pipe extended 150 feet from the catch basin to the anchor at the point where the water was discharged into an open ditch. The slope was 20 degrees. It "slabbed" the declivity. The header or anchor was built of concrete, 7 to 8 feet in length, and extended 2½ feet below the pipe on the lower end, and deeper than this on the upstream side because the pipe set in at rather a sharp angle. It was 24 inches thick on top and 30 inches at the bottom. The fall from the pipe to the bottom of the ditch was 1 to 1½ feet. The ditch ran through a swamp where the soil was wet and water flowed, water covered stones. It was V-shaped, 15 feet wide at the top, at the outlet of the pipe, and gradually narrowing to 8 or 9 feet. The bottom varied from 18 inches to 24 inches wide. For the first 30 feet the depth was 6 to 7 feet. It was riprapped on the bottom and sides with a single layer of cobbles and "one man stones" that is, stones weighing about 100 pounds and 1 foot to 2 feet long, which could be handled by one man without assistance. At the outlet larger stones were used and a thin coating of cement, which had escaped from under the forms used in pouring the anchor, covered the bottom for a distance of 2 to 3 feet. This constituted the apron upon which the water from the pipe would fall. There were no wing walls to the anchor, but the riprap extended up to it, but was not firmly fixed to the anchor farther than 1 or 2 feet above the bottom of the pipe. It appeared without dispute that normal maximum flow, which was

to be anticipated, was 67 cubic feet per second, not to exceed one hour, and, on the basis of a 30-foot drop in elevation, the velocity would be less than 20 feet, and, on the basis of a 40-foot drop, would be 23 feet, per second. This would generate approximately 150 horse power, if the pipe was flowing half full. An expert called by the plaintiff testified that, where the gutter or outlet of a 36-inch pipe was of the dimensions and construction, and extended through soil of a mucky, swampy nature, such as has been described, the maximum velocity which would be safe would be around 7 feet per second; that a discharge of 150 horse power would tear out the lining of one-man stones, and the velocity would carry the water over the apron or cemented part of the gutter, 2 or 3 feet wide, and would exert its force upon the uncemented stones beyond; that it would move these stones, and, if it did this to one or two, it would probably dig out the rest; and that the outlet should have been better protected, as by a concrete basin, in which the energy could be dissipated before the water entered the loosely-stoned channel. It is true that the defendant's evidence was to the contrary in many respects, but, as we have seen, we must take the evidence most favorably for the plaintiff and exclude the effect of modifying evidence, in passing upon this question.

*FLOOD IN SCHOOL HOUSE BROOK.*

 The question of negligence in the construction of the diversion system, in the several respects claimed, being for the jury, the next point for consideration is whether the system as constructed was sufficient safely to care for the waters of School House Brook in times of periodic or expected flood. The plaintiff claims that at the time erosion commenced at the outlet of the 36-inch pipe the brook was not in a state of unusual high water. The defendant's claim is that, at this time, the flood in the brook had attained the magnitude of an act of God, against which it was not obliged to provide. The plaintiff's evidence tended to show that the erosion commenced about 3 p.m. on November 3, 1927.

School House Brook drains an area of about two-tenths of a square mile. Its source is in a small meadow or swamp, about 8 acres in area, lying in a basin bounded by a fairly steep slope of pasture land 20 feet high in places, of sandy soil, rocky, with some timber, the brook flowing out between two sand hills.

Several witnesses, who lived in the village of Cavendish, testified that the water in the brook had been as high as it was at 3 or 4 o'clock on November 3, 1927, many times before. It had usually overflowed Main Street and the surrounding land in the spring and fall, and sometimes during a thaw in the winter, and once during a hard shower. Sometimes in summer or in very dry weather there was little or no water, but, as one witness put it, "I have been there when it was dry and when it was a roaring torrent." The defendant argues that all the former occasions of overflow were when the old culvert was in existence. The culvert, it is pointed out, was built of stone, and was 18 inches deep and 3 feet wide, having in these dimensions a capacity of about 36 cubic feet of water per second, and this capacity was greatly reduced by the displacement of the stones and caving in of the walls, so that, at one place, the opening was found to be not over a foot square. This condition, the defendant claims, accounted for the fact that the water set back and spread out over the road and the adjoining territory, while at the time here in issue, the culvert had been replaced with a 48-inch conduit of about 110 cubic feet capacity, and a capacity of 67 cubic feet would have been all that would have been required to take care of the maximum flow to be expected from normal, ordinary, recurring rains at a basis of 2 inches rainfall an hour, not to be expected to last more than an hour. But the evidence that the brook had overflowed its banks at other times, was not all specifically confined to the immediate neighborhood of the culvert, and one witness testified to previous high water, not limiting it to the highway. Moreover, the plaintiff's testimony went to show that leaves, sticks, and other rubbish were carried down by the brook and lodged against the grating at the opening of the conduit, obstructing the flow, and that men were employed with rakes to remove this material so that the flow should not be impeded. At the time in question the road was not continuously flooded, being at times quite free from water, this being claimed to be due to the clearing away of the obstructions at the grating from time to time. One witness testified that at 7 p.m., when the brook rose so high that the men were obliged to desist from clearing the grating, the water was just crossing the road an inch or two deep. There was also evidence that at 3 p.m. the pipe was not carrying over half of its capacity.

The plaintiff's evidence tended to show that erosion commenced at the anchor at the end of the 36-inch pipe at about 3 p.m. The witness, Mary Bent, at about that hour, observed that water was flowing outside the pipe and that the earth was gradually falling off the top of it, and this condition had then worked back along the pipe for some distance, perhaps two pipe lengths, or about 20 feet. She saw the catch basin opened and the two pipes entering it were seen to be not more than half full of water. At this time a very little water was flowing over the street and sidewalk at the point where the 48-inch pipe went under the road. About an hour later, there was a little water over the sidewalk, but not enough to cause the witness, who wore her rubbers, to get her feet wet. Miss Bent then went to the anchor and found that it had been washed way, several lengths of pipe had gone out, the earth was being washed away from under the pipe and caving off the side hill, the washout growing wider all the time, and being then 10 to 15 feet deep. Other testimony, which it is not necessary specifically to quote, was to the same effect. The questions whether School House Brook was in a state of ordinary or expected flood at the time erosion commenced at the outlet of the diversion system, and whether, due to its construction, it was sufficient to take care of such usual high water, were for the jury.

*DIKE.*

The dike which was built across the former outlet of School House Brook into the pond was about 80 feet in length. It was constructed with a core of sheet steel piling, driven into the ground, which served as a support for an earth embankment 30 feet thick at the base and 15 feet thick at the top. Earth and gravel covered the top of the piling to a depth of 6 inches. There was a driveway along the top of the embankment so formed. The contract between the plaintiff and others and the defendant called for the construction of a dike the top of which should be at an elevation of 108 or 8 feet higher than the crest of the dam which was taken at 100. There were 76 piles, according to defendant's evidence, which being based upon an iron pin as a bench mark at a height of 110.53, showed heights varying from 106.91 to 108.24, and an average elevation of the piling of 107.49. The bench mark was based upon a zero which

gave the crest of the dam at 100, and the plaintiff's evidence tended to show that this was incorrect, and that the iron pin was only 9.97 feet above the crest of the dam at the east end, and 9.83 feet above it at the west end. However, since the relative elevations remain the same, we may disregard the error, and, for the purposes of this discussion, treat the crest of the dam as 100, and all other elevations as based upon it. The witness, Prof. L. B. Puffer, called by the plaintiff, testified that, basing his measurements on 100 as the crest of the dam, the low point of the piling was 106.54 and the average about 106.89. The plaintiff's evidence also tended to show that if water should flow over the dike the earth fill would be washed off down to the level of the piling, as, indeed, it was on the occasion in question.

The plaintiff introduced evidence concerning previous freshets in the Black River to the following effect: Water had risen up to the floor of the rag room of the Gay Brothers' Mill (situated on the river about 1,500 feet above the pond) several times, and usually every spring. Once it flowed just over the floor. This was within three feet of the height of the flood of 1927. The elevation of the rag room floor was 111.16. In midsummer of 1914 the water rose around the Bacon House and up to a point near the Goodell house, both on Depot Street in Cavendish. The elevation of the street opposite the Bacon house is 110.6 and opposite the Goodell house, it is 111.1. A photograph of a freshet taken March 27, 1913, when there was, to the recollection of the photographer, no ice jam, showed the corner of the Depot Street Bridge (across the river below the Gay Brothers' Mill and 1,000 feet above the pond) just showing above the water, and water had been seen as high as this on several occasions. The elevation of the bridge was close to 114.5. But it must be borne in mind that the mill, the bridge, and Depot Street were at substantial distances up stream, and it may be inferred that there was a reduction in elevation when the river reached the pond, although the extent of this diminution is not pointed out in the brief of either party. We must assume however that there was a material fall of the river, because if there were not, high water of these elevations at the pond, would have overflowed the hogback, the elevation of which was conceded to be 111.8, on prior occasions, and there was no evidence that such overflow had ever before occurred.

But a witness, Nellie Adams, testified that in 1913 the water rose to a point which she showed to the witness Edward Plumley. After the flood of 1927, the latter took the difference in elevation between the low point in the piling and the point which Miss Adams indicated and found, by comparison, that the latter was .63 feet higher. When this elevation was taken, the earth fill had been washed away and the piling was exposed. The height of the piling is claimed by the plaintiff to be the height of the dike, and attention is called to the agreement that it should be constructed "of stone, masonry or other similar construction." The question here is, not whether the dike was built according to the contract, but whether it was sufficient to prevent overflow in times of periodic or expected high water. The 6-inch earth fill, on top of the steel piling, must therefore be considered a part of the dike for the purposes of this case, and the height of the dike is the height of the piling plus 6 inches. Even so the dike was .13 of a foot lower than the previous high water as shown by the point indicated by Miss Adams. This difference may be small, but, in view of the testimony tending to show that once water began to overflow, it would carry away the earth fill, and wash out down to the piling, it was for consideration. The evidence standing thus, the question of the sufficiency of the dike to prevent overflow in times of periodic or usual high water was for the jury. It is true that the defendant's evidence was in conflict with that of the plaintiff on these points, but we must take the matter in the most favorable light for the plaintiff.

*FLASHBOARDS.*

█ The plaintiff contends that, in connection with the evidence as to the height of the dike, the presence of the flashboards upon the dam and their effect in raising the level of the water of the pond should be taken into account. At the close of the plaintiff's evidence, the court withdrew the issue of negligence in the construction and maintenance of the flashboards from the consideration of the jury. This ruling is claimed by the defendant to have the effect of striking out all evidence concerning the flashboards from the case. The plaintiff's contention is that, although the issue was no longer before the jury, the evidence was still for consideration as it bore upon other questions. His point is that the defendant was negligent in the construction of

the dike, because it knew, or ought to have known, that it was not planned or built high or securely enough to hold back ordinary flood waters set back by the dam with the flashboards in place. It is necessary, therefore, to determine the scope of the ruling, concerning which the transcript shows as follows: The presiding judge said: "We think and hold that the evidence introduced by the plaintiff does not show any breach of a legal duty owned by the defendant to the plaintiff relating to the maintenance of flashboards on the dam, and the motion (for a directed verdict) is granted in so far as it applies to the maintenance of such flashboards." Then, addressing the jury, he repeated in substance what has just been quoted and added: "So in this case you will give no further consideration to the matter of the flashboards, and will disregard and leave out of your consideration of the case such evidence as has been introduced upon that subject." During a conference with counsel for both parties, immediately afterwards, the presiding judge said that it was "the intention of the court that this ruling should have the effect of withdrawing that part of plaintiff's claim and case for the consideration of the jury." Much later, and during the rebuttal, the plaintiff's counsel reoffered all the evidence relating to the flashboards, saying that he understood that it was in the case, and had not been withdrawn from the jury; that his reason for the offer was that opposing counsel had some question about it, and not to support the claim withdrawn from the jury. The presiding judge said only that he would let the previous ruling stand, and made no comment upon counsel's statement.

We agree with the plaintiff's construction of the ruling. While the statement made by the court to the jury, standing alone, might support the defendant's claim, yet considered in connection with what was said at or nearly at the same time, we take it to have been the intention and meaning only to withdraw the issue of negligence concerning the flashboards, from the jury, but to leave the evidence in the case for whatever it might be worth as bearing upon the other issues still remaining. This being so, the testimony concerning the height and construction of the flashboards was for consideration, so far as it bore upon the claimed negligence in the construction of the dike and its sufficiency in view of the height of the water in the pond. The principle is illustrated in *White's Admr.* v. *Central Ver-*

*mont Ry Co.,* 87 Vt. 330, 89 Atl. 618, where there was a collision between two trains, the locomotive of one of which was defective and leaking steam, so that the view of the engineer was obscured. It was held (page 350 of 87 Vt., 89 Atl. 618), that, even though this defective condition should not be found to be the proximate cause of the accident, it was not necessarily eliminated from the case, but was a circumstance to be considered by the jury in determining whether there was negligence in the failure to notify the crew of the train drawn by this locomotive that there was another train upon the track ahead of it, and to give such orders as might reasonably be necessary to prevent a collision.

The flashboards were composed of three planks each 12 inches wide, making an entire height of 3 feet. The defendant's evidence was to the effect that, shortly before the flood, one plank had been removed from each section, except two or three at the end, leaving a height of 2 feet across the greater part of the dam, and that, after the flood, these sections were found to be bent over to a height of about 1 foot. Plaintiff's witness, Mary Bent, observed them at that time and estimated the height at about 3 feet. Arthur Robinson testified that in the spring of the year, when the flashboards had been removed, water had been seen going over the dam to the height of 4½ feet. This had happened three or four times. After the flashboards had been put on, he had seen water going over them 1½ feet deep, and this (the flashboards being 3 feet high) gave the same height of water as when the flashboards were absent. Alba Davis had seen water a foot above the flashboards, or 4 feet above the dam. With water flowing over the dam at this depth, the evidence tended to show that it might be a foot higher back in the pond, because of the slope of the water flowing toward the dam, and that, under these circumstances, and assuming a dike with a crest of 106.89, the addition of flashboards of 1½ feet, the water would be brought to the top of the dike, since the water would be raised to a point approximately equal to the height of the flashboards. Basing its calculation upon this evidence the defendant has prepared a table, based upon the testimony of plaintiff's witness, Professor Puffer, with the following result: Taking the crest of the dam at 100.7, with water flowing over it at the height of 4.5 feet, would give an elevation at the crest of 105.2; adding 1 foot for increased elevation in the pond would give the elevation at the dike at 106.2; increasing

this by 1.5, the assumed height of the flashboards, gives a total elevation of 107.7. It is contended that this is not as high as the dike, which defendant claims to have been 108.5.

As we have seen, the plaintiff's evidence tended to show an average elevation of the steel piling of 106.89, based upon a zero which gave the crest of the dam at 100. The height of the piling must be increased by the depth of the covering fill, .5 of a foot, so that the height of the dike on this basis would be 107.39. Then, too, the defendant's table is based upon an elevation of 100.7 at the crest of the dam, and, in order to compare it with the plaintiff's contention as to the height of the piling, .7 of a foot must be subtracted, leaving a height of water at the dike, under this calculation, of 107, less than the height of the dike.

The defendant introduced the evidence of H. M. Turner, to the effect that the dam, without flashboards and with the sluice gates open would discharge 6,700 cubic feet of water per second without setting the water back over the elevation of the dike. The plaintiff's witness, Professor Puffer, testified that with this discharge, and under these conditions the level of the pond would be raised 6.3 or 6.4 feet. The necessary conclusion from this is that with the addition of 1½ feet flashboards, the crest of the dam being taken at 100, the height of water at the dike would be 107.8 or 107.9, which would overflow the dike, 107.39 in height. True it appeared that a discharge of 6,700 cubic feet per second was more than was to be reasonably expected, and that the greater discharge previously known, during the freshet of March, 1913, was 6,000 cubic feet per second. But there was evidence tending to show that the high-water mark at that time, when there were no flashboards, was .13 of a foot above the top of the dike, and so the inference was permissible that in times of periodic or expected high water, the addition of flashboards of the height indicated would raise the level of the pond above the dike.

The defendant calls our attention to the fact that the high water of 1913 occurred in the spring and was caused by the melting of ice and snow with the resultant run off. It is contended that an equal condition of high water at other seasons of the year was not to be reasonably expected, and therefore that there was no obligation to provide against it by removing the flashboards as was regularly done in anticipation of the regular spring freshets. But, without going further, it is enough to say

that in view of the heavy and long continued rainfall during the month of October, 1927, to the extent of which we shall presently refer, it could not be said as a matter of law, that high water as great as in the spring floods should not have been foreseen and the flashboards removed to minimize its effect. We conclude that the presence of the flashboards was not without probative force in connection with the evidence concerning the sufficiency of the dike to restrain periodic or expected floods.

■ An important question is whether the discharge of the flood water, after reaching the highway at the cut through the hogback, was the result of the erosion along the pipe line working backwards to the road; or was caused by the action of the water itself in overflowing and washing out a ditch along the west side of the road so that a channel was thus excavated across the road to the easterly side.

The water from Black River, as the evidence tended to show, overflowed the dike at about 6.30 p.m., and filled the low land back of the houses facing the easterly side of Main Street, with a swift current. It rose until it went over the highway at the hogback and down the hill beyond the cut. Sometime after 9 p.m., while the water was running over the road, the defendant's witness R. B. Minch, with others, dug a small ditch along the westerly edge of the road, so that the water would find an outlet. The water as he testified, was then on the west side of the road, and not on the east side. The ditch (or "guzzle," as it was called) was at first 6 to 8 inches wide, and 2 to 3 inches deep. When the digging reached the high point in the road, the water washed out the soil and within a half hour, the ditch was 6 feet wide, the current which flowed through it breaking off the earth. Very soon it was 2 to 3 feet deep and, later, 6 to 8 feet deep, at which time several houses were washed away, the first to go being the Sperry House on the west side of Main Street. About one-half the width of the road was left to the east of the ditch, and it was 50 to 75 feet from the place where erosion was going on along the pipe line. The soil in the road became soft and was being washed away. On testimony to this effect the defendant bases its contention, that the washout was due to erosion from the ditch rather than from the pipe line.

But there was evidence from which the jury could find to the contrary. The plaintiff's witness Kenet went to the hogback a little after 11 p.m. while the men were working on the

ditch or "guzzle." He was able to jump over it, and proceeded down the road, observing that the ditch was taking care of the water. Then water appeared in the road on the other side in little rivulets. He lost his way in the dark, and came as he testified to a place some 50 feet east of the road. Here, as he stood, he felt the ground moving under his feet, and leaping back he observed, by the light of his electric torch, the soil give way and a pipe tip over. Turning toward the road, he saw that it was cut off to three-fourths of its width from the east side, leaving a space toward the west. The cut in the road he described as a "big hole." Within a short time this cavern worked backward a distance of 50 feet. There is some dispute as to just where the witness was standing when he felt the ground moving under him, but there was evidence from which the jury could find that it was approximately over the pipe line. Another witness, Bemis, testified that at about 11 p.m. he observed a hole in the road, directly over the pipe line, which kept working backward following the pipe. He watched its progress until it passed the house of Tony Prokulewicz, the most northerly house on the east side of Main Street (marked 12 on the reproduction of Plaintiff's Ex. 1, *supra*). The testimony above recited tended to show that the excavation caused by the erosion of the pipe line, in working backward from the outlet, reached and destroyed the road, thus leaving a sluiceway down a steep incline, through which the flood waters flowed with great velocity.

There was, as we have seen, evidence tending to show that the diversion system was negligently constructed and that erosion commenced along it at a time when School House Brook was not in a state of extraordinary and unprecedented flood; that this erosion worked back, following the pipe line until it reached the highway at or near the point where it passed through the Hogback; that the dike was not as high as the previous high-water mark; and that the water from the Black River, after overflowing the dike, filled the lowland between Main Street in Cavendish village on the west and the Hogback on the east, and, having risen above the high point in the highway, followed the excavation caused by the erosion down the declivity to the east beyond the Hogback.

It remains to consider those grounds of the motion for a verdict which raise the question whether there was evidence tend-

ing to show that the defendant's negligence was an efficient cause of the injury.

We must, as we have held so many times, take the testimony in the most favorable light for the plaintiff. *Higgins* v. *Metzger,* 101 Vt. 285, 291, 143 Atl. 394; *Cummings* v. *Connecticut General Life Insurance Co.,* 101 Vt. 73, 85, 142 Atl. 82. We must exclude the effect of modifying evidence. *Ste. Marie* v. *Wells,* 93 Vt. 398, 399, 108 Atl. 270. Contradictions and contradictory inferences are for the jury. *Comeau* v. *Manuel & Sons Co.,* 84 Vt. 501, 509, 80 Atl. 51. And so also if the testimony is improbable, provided it is not impossible. *Robey* v. *B. & M. R. R.,* 91 Vt. 386, 388, 100 Atl. 925. The tendency of the evidence and not its weight is to be considered. *Cummings* v. *Connecticut General Life Insurance Co., supra; Fraser* v. *Blanchard,* 83 Vt. 136, 147, 73 Atl. 995, 75 Atl. 797. But, on the other hand, the evidence supporting the claim must be more than a scintilla. *Gilman* v. *Central Vermont Ry. Co.,* 93 Vt. 340, 349, 107 Atl. 122, 16 A. L. R. 1102. The question is not merely whether there is any evidence to this effect, but whether it is of such quantity and character as to justify a jury, acting reasonably, to predicate a verdict thereon in favor of the party having the burden of proof. *Wellman* v. *Wales,* 98 Vt. 437, 448, 129 Atl. 317. "Evidence which merely makes it possible for the fact in issue to be as alleged, or which raises a mere conjecture, surmise, or suspicion, is an insufficient foundation for a verdict." *Wellman* v. *Wales, supra,* page 440 of 98 Vt., 129 Atl. 317, 319; *Ronan* v. *J. G. Turnbull Co.,* 99 Vt. 280, 287, 131 Atl. 788.

The magnitude and the extent of the destructive power of the flood was clearly shown by the evidence. The month of October, 1927, had been exceptionally wet, the precipitation commencing October 1 and ending November 2 having reached the unprecedented amount of 5.72 inches, much greater than had been before recorded. On November 3, up to 5.30 p.m. the rainfall was 4.92 inches, again exceeding all records. Still more rain fell between 5.30 and 6.30. The ground had become saturated by the previous rains, and so little of the precipitation of November 3 was absorbed that a large run-off resulted. The water of the Black River rose rapidly, overflowing the streets, houses, and mills in the villages upon its banks, scouring the meadows, carrying rocks and trees in the current, undermining

and washing away buildings, and interrupting all communication by highways or telephone. After 2.30 p.m. on November 3 there was no railroad service for eighteen days. In one highway district alone ten steel truss bridges and one iron I-beam bridge were washed out, in one instance the structure being carried downstream for a distance of 350 feet. In Plymouth, some distance up the river from Cavendish, twenty-six bridges were washed out, some of them steel, and one was doubled up and carried away for a distance of 40 to 50 feet. About sixty bridges and culverts were washed out on the Black River and its tributaries. At one place a 500-gallon gasoline tank, buried in the ground, with one and a half to two feet of earth over its top was washed out and carried across the road. One witness, a resident of Ludlow for seventy-one years, testified that he had never seen the water as high as it was in the evening of November 3. The Black River takes the watershed of the mountains on each side of it.

At Cavendish the high water marks varied from 112.62 to 113.99, based upon the corrected elevation of the dam at 100.7. The highest point in the highway where it passed through the hogback was 111.8. So it appears that, even taking the lowest highwater mark, the flood rose to a point substantially one foot above the highway cut, near the point where the diversion system branched off toward the catch basin, and about four feet above the dike, even assuming the defendant's claim of 108.5 as its lowest point to be correct.

Tested by the rule we have stated, the sufficiency of the dike is not a factor in the case. Whether the jury should accept the plaintiff's or the defendant's testimony as to its height and its sufficiency to restrain ordinary freshets, it is perfectly evident that the high water of November 3 overtopped it by at least four feet. It is purely a matter of conjecture whether its claimed insufficiency could have had any effect upon the events of that evening. It may be argued that, if it had been higher it would have held back the water for a longer time, but, according to the plaintiff's claim the erosion was continually working back along the pipe line toward the highway, and a retardation at the dike would simply give more time for the formation of the sluiceway and would not prevent the water from rushing into it. And, again, on the most favorable view of the evidence, the lowest part of the dike was only .13 of a foot below the previous

high-water mark. This discrepancy even taking into consideration the possible effect of the flashboards is so slight and its practical effect upon the flood of November 3 so microscopic, that no jury could, without entering the field of surmise and conjecture, reasonably base a finding thereon to the effect that any negligence in this regard was a cooperating cause of the disaster. It was, therefore, error to refuse to withdraw this issue from the consideration of the jury, under the seventh ground of the motion for a directed verdict, which was, in part, that "there was no evidence having any tendency to show any negligent act or omission of the defendant that cooperated or concurred or mingled with the Act of God as an efficient agency or cause of the damage."

The hogback was composed of unconsolidated glacial materials, stones varying in dimensions from the size of a man's two fists, to gravel, coarse and fine, and in some places to a fine sand with a certain amount of clay in it; there was also, in the northerly part, a formation of decomposed rock. In prehistoric times, after the melting of the ice cap which once covered the region to a great depth, the ridge formed the bank of a lake. The ice, in coming down across the country, brought with it from the north an enormous quantity of material, which apparently caused a dam in the course of the river that had previously flowed through the Black River valley. This dam, which here became what is called the Hogback, forced the river back from its channel and caused an outlet to be forced through the present gorge. The village of Cavandish was, in modern times, and thousand of years after the lake had disappeared and the river had taken its present course, built upon what had been the prehistoric river bed. The Hogback had never before been washed out because the water had never risen high enough to overflow it, or to start gullying. Standing water does not cause erosion, because there must be current to carry the soil away. There is no difference in erosive power whether water is set in activity by rising by itself over a ridge or whether it is tapped from below by an excavation; the same result follows whether the still waters of a lake are started into a current which begins down a hill and backs up and taps the lake, or the waters are started by rising until they overflow the brow of a hill. The erosion and transportive powers of running water go together, and the transportive power increases as the sixth power of its velocity;

that is to say, if the velocity is doubled, the transportive power increases sixty-four times, and if the velocity is quadrupled, the transportive power increases about 4,000 times. The velocity increases with the pitch of the bed of the running stream. All of the foregoing appeared without dispute from the testimony of a geologist and engineer of high reputation, called as an expert witness by the plaintiff.

The plaintiff argues that, without the sluiceway formed by the erosion of the pipe line, the flood water would have spread harmlessly over the slope to the west of the highway, beyond the cut through the Hogback, and would not have taken its course down the much steeper declivity toward the river on the east side. Before the erosion along the pipe line reached the highway, as the evidence tended to show, the water was flowing over the road, in rivulets to each side. Gullying had commenced because little ditches, apart from the one dug along the west side, had been formed. But there was also evidence that, on the east side the ground was some three feet higher than the traveled surface of the road, and this condition would justify a jury in concluding that the water would, if no artificial ditch or outlet had been made on that side, have deflected the current to the west, or straight along the road, and so prevented the creation of a waterfall down the bank to the east toward the river. This would, from the relative slope of the land on either side of the highway beyond the Hogback, have resulted in an appreciable diminution of the velocity, and, consequently, in the erosive power of the current. It cannot be said, therefore, that there was no evidence fairly and reasonably tending to show that the negligence of the defendant in the construction of the diversion system cooperated with the Act of God in causing the damage, and the motion for a directed verdict was properly denied upon this ground. As we have said, there were numerous grounds stated, but so far as they have been briefed, we have given attention to all of them, although not specially mentioned.

█ █ In the defendant's brief the exceptions to the charge are arranged in three groups, the first of which includes several exceptions to the charge as given and to the failure to charge as requested, concerning the dike and structure in the river. The jury were instructed that it was the duty of the defendant to construct the dike of sufficient height, width, and length, including the sheet steel piling and fill over and around

it, when considered in connection with the dam or obstruction maintained by the defendant below the location of the dike, to keep the waters of Black River from overflowing in times of ordinary condition of the river, or in times of usual or periodic high water reasonably to be expected, and that, if the dike as constructed did not meet these requirements, the defendant was negligent. It is claimed that there was no basis in the evidence for submitting the question of the sufficiency of the dike, under these conditions, to the jury, but, as we have seen, there was evidence from which the jury could find that the dike was not as high as the elevation of previous high water, so this objection is unavailing. We have however, pointed out that the claimed negligence in this regard cannot be regarded as an efficient cause of the damage. The defendant requested an instruction that in the construction, maintenance, and operation of the dam the defendant was not under any duty to provide against an extraordinary flood such as the flood of 1927, and also an instruction that unless it should be found that the defendant's structure in the river was such as to cause the water to overflow the dike in usual, ordinary, and periodic high water reasonably to be expected, the defendant would not be liable for the effects of that structure in the extraordinary flood of 1927. An exception was taken to the court's failure so to charge. Error does not appear. The question of negligence in the construction and maintenance of the dam and flashboards had been withdrawn from the jury's consideration. As we have seen, the evidence as to the previous high water, which the plaintiff's evidence tended to show was of a greater elevation than the dike, related to a time when there were no flashboards on the dam, which fact was not disputed. There seems to have been no claim of negligence with regard to the construction of the dam. The reason given for the exception at the trial was that the defendant thought it was entitled to have the proposition embodied in the request distinctly set out. The exception referred to the request by number only. This was not sufficient to apprize the court of the claimed error. *Kiley* v. *Rutland R. R. Co.*, 80 Vt. 536, 550, 68 Atl. 713, 13 Ann. Cas. 269. Another requested instruction, the noncompliance with which was made the subject of an exception, was to the effect that the height of the dike was the elevation of the fill over which the water would flow and not the elevation of the steel piling. This, we think, was so, but there

was a substantial compliance with the request in the instruction that it was the duty of the defendant to construct the dike of sufficient height, width, and length, including the piling and the fill around and over it, to restrain the overflow in times of usual or periodic high water.

The second group of exceptions to the charge include those taken to the failure to comply with three requests (the 6th, 7th, and 12th), which are, in substance, as follows: That if the act of God in this particular case was of such an overwhelming and destructive character as by its own force, and independently of the particular negligence alleged or shown, to produce·the injury, the defendant would not be liable, even though negligent in the construction of the pipe line; that the injury should be attributed to an act of God if the extraordinary rainfall and flood would have caused it notwithstanding any negligence on the part of the defendant; and that if, by reason of the extraordinary flood, the water overflowed Main Street and the Hogback in such quantity and with such force as in and of itself to cause the washout, the defendant was not liable, though negligent in the construction of the pipe line. We think that these instructions should have been given. The court, it is true, charged that there was no liability for a loss caused directly and exclusively by an act of God (which was adequately and properly defined), and that, unless it were found that the negligence of the defendant "so mingled with the operation of the extraordinary flood of November 3, 1927, so as to be an active cooperative and proximate cause of the injury," the verdict should be for the defendant. This was correct, so far as it went. The principle that if the act of God were of such magnitude and overwhelming force that the injury would have been inevitably caused by it without regard to any act or omission of the defendant was of course logically involved in the statement, for the question is, as we have already said, one of causation. However, in the circumstances of this case, and the complexity and volume of the testimony, the court should have gone farther and stated in detail the precise point to the jury, who might, under the charge as given, have felt themselves at liberty to find for the plaintiff if they were satisfied that the erosion along the pipe line, caused by the defendant's negligence, created the ditch or excavation down which the flood water took its course after overflowing the Hogback, without considering whether this,

or some other, sluiceway of equal extent would have been created by the pressure of the flood had there been no improper construction of the diversion system, or indeed, no diversion system at all. We have already stated the legal principles which are applicable to this controversy, and it is not necessary to repeat them. These exceptions are well grounded and must be sustained.

The third group comprises one exception to the refusal to comply with the 10th request which was that if the jury should find that at the time the concrete anchor washed out and the section of the pipe line broke loose and caused erosion of the soil, the waters of School House Brook had reached a stage of flood beyond that which might be reasonably anticipated from normal freshets or periods of high water, the defendant was not liable for injuries to the plaintiff's property resulting from the washing away of the anchor and its pipe line. In its brief the defendant argues that the evidence conclusively showed that School House Brook was in a state of extraordinary and unprecedented flood at the time the anchor washed out. But this is not the point involved, in the request, which, from its wording, assumed that there was a question for the jury upon this issue. We have already held that this was so. It is also urged that it was the duty of the court to instruct the jury upon the law applicable to this subject, and that there was nothing said in the charge concerning the duty or liability of the defendant respecting the anchor and outlet ditch. But an examination of the charge discloses that reference was made to these matters, and, although in connection with other claims of negligence, sufficient to call the jury's attention to the duty of the defendant with regard to them. Furthermore, it would not necessarily follow that because the destruction of the anchor and washing out of the pipe line occurred after the brook had risen to an unprecedented freshet, there would, as a matter of law, be no liability for the faulty construction of the diversion system. The test was whether it was sufficient to take care of the water in times of usual or periodic flood. If it were not, and the negligence concurred and co-operated, as an efficient cause, with the act of God in causing the damage, there would be liability. The time when it gave way, taken alone, would not be conclusive, unless the act of God were of such an overwhelming nature that the injury would have been caused in any event.

This consideration was omitted from the request, which, for this reason, was properly refused.

The fourth, and last group, includes exceptions taken to the noncompliance with the 14th and 17th requests. The first of these embodied the proposition that in the construction, maintenance, and operation of the dam, the defendant was bound to consider its effect in raising the water in ordinary floods reasonably to be expected at Cavendish at the then season of the year, and if the jury should fail to find that the dam, on November 3, 1927, would raise floods reasonably expected to occur at that time to an elevation sufficient to overflow the dike, the verdict must be for the defendant. The second stated the same proposition with respect to the defendant's structure in the river. But, to go no farther, both of these requests made the defendant's liability to depend alone upon the sufficiency of the dam, and structure (which we understand to include the flashboards) and their effect in raising the water above the dike. The sufficiency of the diversion system was left out of consideration. There might be no negligence in the construction and maintenance of the dam and structure (if it were an issue), and yet there might be negligence in the construction of the pipe line, which, being an efficient cause of the damage, would make the defendant liable. No error appears in the refusal of these requests.

Several exceptions were taken to the admission of certain testimony given in answer to questions put by plaintiff's counsel in the course of the cross-examination of a witness called by the defense, and in the direct examination of a witness called by the plaintiff in rebuttal. The questions referred, in one way or another, to the effect of the flashboards on the height of the water in the pond. The objection in each instance was that all the evidence relating to the flashboards had previously been withdrawn from the consideration of the jury and, consequently, that there was no basis for the assumptions upon which the inquiries were based. We have already considered the scope of the ruling concerning the flashboards, and have held that its effect was to withdraw the issue of negligence in their construction and maintenance, but that the evidence was still in the case for what bearing it might have in the other issues. So the objection is without force. One of these exceptions was to the following question: ''Is it not a matter that is recognized by

you that a 3-foot flashboard will raise the surface level of the water 3 feet in the pond?'' The answer was: ''Under some circumstances, yes.'' It is contended that there was no evidence warranting an assumption that, at the time of the flood, there were flashboards of this height. The flashboards were in sections, each of which was composed of 3 one-inch planks, each 12 inches wide, secured on edge, one above the other, by iron pins set into the crest of the dam. The defendant's evidence was to the effect that October 21, 1927, one plank was removed from seven of the sections, leaving the flashboards at full height for two or three sections at one end; and that after the flood the flashboards were found to have been bent over by the force of the water so that the height above the dam was approximately one foot. But the testimony of the witness Mary Bent, called by the plaintiff, was that, a few days after the flood, the flashboards were, in her judgment, about 3 feet higher than the crest of the dam, and slightly bent over. This was sufficient to form a basis for the question. Another objection is that the question was not cross-examination. But ''the scope and extent of cross-examination rests largely in the sound discretion of the trial court, and its ruling thereon is not revisable in the absence of an abuse thereof.'' *Town of Brattleboro* v. *Carpenter,* 104 Vt. 158, 176, 158 Atl. 73, 81. No abuse of discretion is perceived in this instance.

██ ██ The series of exceptions taken to questions asked the plaintiff's expert witness, Prof. Louis B. Puffer, on direct examination, during the rebuttal, do not require separate treatment. All of the inquiries were in regard to the effect of the presence or absence of flashboard upon the elevation of water in the pond. The objections briefed are, as before, that there was no basis for the assumption upon which the questions were based, since the evidence relating to the flashboard had been withdrawn from the case. This claim, as we have seen, is not sound. A further objection is that the testimony was not rebuttal. Concerning this we need not inquire, because the order of the reception of evidence lies in the discretion of the trial court, and, no abuse of discretion here appearing, the rulings are not revisable. *Shields et al.* v. *Vermont Mutual Fire Insurance Co.,* 102 Vt. 224, 251, 147 Atl. 352; *Paska et al.* v. *Saunders et al.,* 103 Vt. 204, 212, 153 Atl. 451. The contrary not appearing, we assume the rulings to have been made as mat-

ters of discretion. *Paska et al.*, v. *Saunders et al., supra* and cases cited.

The defendant took exceptions to the exclusion of questions asked on direct examination of his expert witness, H. M. Turner. All of these inquiries were substantially alike, and are briefed together as raising the same issue. The object was, apparently, to show that, with the dam and dike in the condition they were on November 3, 1927, the greatest rainfall previously known, in October, 1912, would not have caused an overflow of the dike. One question may be taken as an example: "Assuming that in the eighteen hours next before 5.30 p.m. November 3, 1927, the rainfall in Cavendish was 4.92 inches; that it was raining hard from 5.30 to 6 p.m., and that in the month of October, 1927, there had been a rainfall of 5.72 inches if the water in the river rose to the elevation of the top of the dike at 6 o'clock p.m. what do you say as to whether with the dam in the condition it was November 3, 1927, the rainfall of 4.88 inches in twenty-four hours October 23-24, 1912, with the ground in the condition it would be with a rainfall of 1.83 inches in a similar period preceding it, could have overflowed the dike?"

Another question differed from the one quoted in assuming that the water overflowed the dike at 6.15 p.m. The objection was that there was no evidence supporting the assumption that there was an overflow from the pond at 6 p.m. or 6.15 p.m. But the error, if any, is not shown to have been harmful. The same witness was permitted to testify that, under the same conditions, with the water overflowing the dike at 6.30, 6.45, and 7.00 p.m. on November 3, 1927, the rainfall of October, 1912, would not have caused the water to overflow. The evidence showed, without dispute, that the water rose rapidly from 4 to 4.30 p.m. and kept on rising after 6 p.m. on November 3, 1927. It was, therefore, higher at 6.30, 6.45, or 7.00, than it was at 6 or 6.15 on that day. There is no evidence, so far as has been pointed out, that the peak of the freshet of October 24, 1912, was reached at 6 or 6.45 p.m. The contrary not appearing we must assume that the water on that occasion was, at least, at the same height at that time as it was during the course of the next two hours. If it could not have risen to the height of the dike at 6.30 or later, it is a necessary conclusion that it could not have done so at 6 or 6.15. The defendant, therefore, had the substantial benefit

of the excluded testimony, and the exceptions are unavailing. *Cummings* v. *Connecticut General Life Insurance Company,* 101 Vt. 73, 83, 142 Atl. 82.

As we have seen, the evidence showed that a hard shower occurred during the construction of the diversion system, as a result of which several lengths of pipe were washed out and other damage was done to the uncompleted work. Later on, during the direct examination of the plaintiff's expert witness, Prof. E. C. Jacobs, he was asked to assume that three lengths of the pipe near the catch basin were broken up, and upset, during a rainstorm, during the construction, but after the ditch had been filled, that one length of pipe was found with one end sticking out of ground, and the other sections out of alignment, and that the bottom of the trench had been eroded below the level at which the pipes had been laid, and to say what was the significance of these facts to him, as a geologist. He answered, subject to the defendant's exception, that it would signify that there had been an erosion of water flowing outside the 36-inch pipe. He also testified, subject to the same exception, that the erosion underneath the pipe signified the same thing, and that, assuming that water were seen flowing outside the 36-inch pipe at the place of discharge at any time, it would mean that there must have been waterways outside of the pipe and that, in his opinion, the effect of water flowing outside of such a pipe line would be to entrain the soil and carry it with it to a greater or lesser degree. Professor Puffer, another expert, was asked practically the same hypothetical question concerning the assumed conditions of the pipe line after the shower, and answered subject to exception that the facts indicated that the trouble had been caused by water. This witness, then testified, also under exception, that if water had been observed flowing in water courses outside the 24-inch pipe and the 48-inch pipe on both sides, it would indicate that the backfill had not been placed with sufficient care so as completely to fill the space under the pipe. Later on he was asked whether in the practice of engineering skill, as ordinarily applied to such work, an engineer ought to give consideration to the upheaval of the pipes by water during construction and the excavation of the trench in which the pipes had been laid, as bearing upon the question whether the voids had been filled in underneath the level of the pipe line, and answered, subject to exception, that special con-

sideration ought to have been given to the replacement of those sections or pipe so that water could not get under them again. All the foregoing exceptions are briefed together.

 It is argued that a washout of the character and occurring under the conditions described, while the work was in progress and before the catch basin or pipes had been completed for the reception of water, was not evidence tending to show negligence in the construction; and that, if the cement of the catch basin had been poured so that it surrounded the ends of the pipes, as it ultimately did, no water could have flowed along the sides or underneath the 36-inch pipe. But the evidence above recited had a tendency to prove, not only the effect of water as an erosive force, but also that under the circumstances, known to the defendants, care should have been taken to make sure that all voids around or under the pipes were completely filled. There was no error in the rulings.

 The plaintiff's expert witness Puffer was asked on direct examination: ''Assume this condition that at the time of an ordinary flood (in School House Brook), and before it has arrived at extraordinary proportions, and while it is pouring over the surface of the roadway, some of it goes down into an obvious hole by a whirlpool, at the location of the pipe line, at the location of both the 48- and 24-inch pipe line; what do you say whether there is a means of access to these waterways alongside the pipe line other than by percolation?''

The answer, received under exception upon the ground that the assumption that the brook was then in a state of ordinary flood was unwarranted, was: ''It is obvious that water flowing down it was finding its way out through some subterranean channel, either inside the pipe or outside of it; if the water could not enter the pipe it must have found its way out through a channel outside the pipe.''

The testimony of plaintiff's witness, Tony Prokulewicz, was that he observed the water going down into the hole at about noon on November 3. It is true that he did not describe a whirlpool, but since that is not the ground of objection, we do not consider it. We have already considered the testimony concerning the high water in School House Brook, and have held that there was evidence tending to show that it was not in a condition of unprecedented flood, at least before 3 or 4 p.m. There was

therefore, a ground for the assumption contained in the question, and no error appears in the admission of the answer.

 The plaintiff was permitted to testify that to his knowledge nothing was done by the defendant to line an open ditch which extended from the dike to the intake of the 24-inch pipe in the rear of the plaintiff's premises. The exception taken was that there was nothing in the specifications or agreement concerning the construction of the diversion system, that required or caused it to be expected, that this ditch would be lined or protected in any way. The 24-inch pipe, it is pointed out, was intended to be only a means of draining surface water. The plaintiff justifies the ruling upon the ground that, since the evidence showed a smaller amount of erosion, and therefore less velocity of the water in the vicinity of the dike and the open ditch at the intake of the 24-inch pipe than there was at the lined ditch at the outlet of the 36-inch pipe, it might be inferred that the proximate cause of the damage was not the water that flowed over the ditch near the dike, but was the water discharged into the lined ditch at the outlet of the 36-inch pipe coming from the inside and outside of that pipe. In view of this theory, error in the ruling is not affirmatively shown. It nowhere appears that the failure to line the ditch was claimed to constitute a breach of duty on the part of the defendant, and, indeed, it is not clear how there could have been prejudice in the admission of the evidence.

 The expert witness Jacobs was asked on direct examination: "Can you hope to stop the existence of waterways alongside the outside of a pipe line by constructing cement collars in a material that is wet, finely divided, and affords no firm, solid contact with two ends of such collars?" The answer was: "It would depend upon the continuity of these waterways either side of that impervious layer in my mind." The next question was: "In order to create a barrier to waterways alongside the outside of a pipe line, by means of cement collars extending a foot, 12 inches approximately, on both sides away from a 24-inch pipe, what must they be put against in the trench in order to stop the flow of waterways, or the existence of waterways around those ends?" The answer was: "Why to completely stop it I would say they ought to be put against an impervious material." Both answers were received subject to an exception. The objection is that the questions were based upon

the assumption that the cement collars were built against wet and finely divided material on either side, whereas the evidence was undisputed that they were built against hardpan, impervious to water. To sustain the rulings, the plaintiff calls attention to the testimony of several witnesses who said that underneath the hardpan at the bottom of the trench of the 24-inch pipe quicksand was encountered, after the impervious layer had been broken through. But this evidence does not meet the objections. The questions related to the ends of the collars, and what ought to be done to prevent the flow of water around those ends. The evidence quoted by the plaintiff might have some significance concerning the flow of water underneath the collars, but not around the ends of them. So the admission of the answers was error, but we cannot say that it was prejudicial, because, if anything, the testimony tended to support the defendant's claim that no water could find its way around the sides of the collars.

In reference to the anchor at the outlet of the 36-inch pipe, the following question was put to the witness, E. C. Jacobs: "If wing walls were erected in such a situation as I have described on both sides of the outlet of such a pipe, and if the basin into which said pipe discharged were made firm by concrete or by other masonry so that the water discharging from that pipe when flowing full were cared for and taken away, what do you say, under such circumstances whether the soil around the anchor would be disturbed by the erosion thereof?" The answer was: "I can conceive that gullying would not have taken place under the conditions you mention."

The exception taken in this instance was upon the ground that, if the pipe were flowing full, the brook would have been in a condition of extraordinary flood, against which there was no duty to provide. Attention is called to the evidence that the capacity of the 36-inch pipe was about 110 cubic feet per second and the maximum flow reasonably to be expected from School House Brook was sixty-seven cubic feet per second. From this it is argued that, if the 36-inch pipe were running full, a state of extraordinary flood would conclusively appear, and that, since the defendant was under no obligation to antici- pate and guard against such a flood, the evidence was inadmissible. On the other hand, the plaintiff testified that between 4 and 5 p.m. on November 3, he observed that the pipe was run-

ning practically full and other witnesses testified that at this time of the day School House Brook was no higher than it had been before. In addition to this, it will be remembered that the 36-inch pipe carried not only the water from the brook, which came through the 48-inch pipe to the catch basin, but also discharged the water from the 24-inch pipe. There was, therefore, evidence to support the plaintiff's theory, and there was no error in the ruling.

An exception was taken to a question put to the witness E. C. Jacobs, based upon the previous testimony of the witness Barney Kenet. The question was: "Would this assumption be of a significance to you—that a man standing somewhere in the vicinity of the trench in which was laid a 24-inch pipe in the bottom, and a 48-inch pipe on top of it, felt the earth move beneath his feet, jumped and swung his lantern—his search light—downward, as he turned to the left, and observed a section of pipe—or what looked like a section of a pipe, turned over, would that have any significance to you with respect to what was going on in the place where that pipe was?" The witness answered: "It would have some significance." And was then asked: "What would be the significance?" And answered: "That there had been undermining there." The objection was that there was no evidence that Kenet was standing in the vicinity of the trench containing the two pipes.

Kenet testified on direct examination that about 11 p.m. he walked along Main Street, over the Hogback, toward Whitesville, with the aid of a flashlight, which threw a circle of light "about a foot round." He was guiding himself by holding the light down, at arm's length, looking for a place to step. He came to a place where he could see neither the ground or the road, felt a tremor under his feet, and jumped back. Holding his flashlight out straight, as he jumped, he saw the ground move away and, at the same time, the form of a pipe roll over; then turning to his left, toward Whitesville, he saw that the road was cut off. He said that he was standing about 50 feet easterly from Main Street, between a gate leading to a pasture of the highway, and the Power House Road, so-called, a lane leading northeasterly from the highway. The gate was between the highway and the location of the pipe line. The catch basin was distant about 70 feet from the highway.

The defendant argues that there was no evidence that Kenet was ever more than 25 feet from the highway, but this claim is met by his testimony that he was about 50 feet away from it when he felt the ground give way beneath his feet. It was dark and a mist or fog was in the air, and his only illumination was from his electric torch. His estimate of distance and location must have been approximate only. But his testimony afforded a reasonable inference that he was in the vicinity of the pipe line, as assumed by the question, and its admission was not error.

An exception was taken to an allegedly prejudicial statement made by plaintiff's counsel, in the course of a discussion upon the admissibility of certain evidence offered by the plaintiff in surrebuttal. In answer to an objection, counsel said in effect that in the last hour of the case the defendant, having in its contract with the plaintiff, assumed the height of the dam to be 100, changed its claim of the height, and stated that it was 100 plus something. This statement of counsel is claimed to be inconsistent with the record, because exhibits introduced early in the case showed that the height exceeded 100. However, the language was used in addressing the court and not the jury. Counsel was urging the reconsideration of a ruling which had excluded the offer and there is no appearance of bad faith. Without considering whether there was basis for the defendant's claim, it is enough to say that, if there was error, prejudice is not affirmatively shown; and, at any rate, the question is not likely to recur upon a subsequent trial.

The defendant moved to set the verdict aside upon the ground that it was wholly unsupported by the evidence, and excepted to the denial of the motion. The same questions are involved as in the motion for a directed verdict. *Twin State Fruit Corp.* v. *Kansas,* 104 Vt. 154, 157, 157 Atl. 831; *Paska et al.* v. *Saunders et al.,* 103 Vt. 204, 217, 153 Atl. 451; *Farnham & Sons Co.* v. *Wark,* 99 Vt. 446, 451, 134 Atl. 603. What we have already said regarding the latter motion is applicable here. It is not necessary to give further attention to this exception.

There is a dispute concerning the theory as to the burden of proof affecting the issue of the act of God, upon which the trial proceeded in the court below. The reason seems to be that both parties share in the understanding that, if a definite theory had been adopted by acquiescence, it would become the law of the

case and would be binding in any subsequent trial of the cause, which would have to be conducted in conformity to it. But this understanding is erroneous. The phrase "law of the case" has been often used, but not always clearly or consistently. An opportunity is here presented to clarify its meaning.

▇▇▇ It is essentially a rule of practice. "In the absence of statute," says Mr. Justice Holmes in *Messinger* v. *Anderson*, 225 U. S. 436, 444, 56 L. ed. 1152, 1156, 32 Sup. Ct. 739, "the phrase 'law of the case,' as applied to the effect of previous orders on the later action of the court rendering them in the same case, merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." And again, in *Remington* v. *Cent. Pac. R. R. Co.*, 198 U. S. 95, 100, 49 L. ed. 959, 963, 25 Sup. Ct. 577, 579, "However stringent may be the practice in refusing to reconsider what has been done, it still is but practice, not want of jurisdiction, that makes the rule." "The doctrine is not that of *stare decisis,* nor yet that of *res judicata,* though kin to each. It rests for its absolute integrity upon sound public policy which does not permit the parties * * * to go again and again to the Supreme Court upon the same question." *Guilmont's Admr.* v. *Central Vermont Ry. Co.*, 82 Vt. 266, 267, 73 Atl. 850. But the power of the court to depart from the rule, in a proper case, clearly exists. *Pellon et al.* v. *Ins. Co.*, 107 Vt. 129, 178 Atl. 902 (decided at the January term, 1935).

The phrase has been employed indiscriminately in referring to (1) previous adjudications of an appellate court in the same case; (2) rulings of the trial court, not made subject to exception; and (3) where a certain theory of the law has been adopted upon the trial by the parties and the court. There is, however, a clear distinction between these situations.

▇▇▇ (1) The principle is clearly stated in *Barclay* v. *Wetmore & Morse Granite Co.*, 94 Vt. 227, 230, 110 Atl. 1, 2, as follows: "It is a rule of general application that a decision in a case * * * of last resort is the law of that case on the points presented throughout all the subsequent proceedings therein, and no question then necessarily involved and decided will be reconsidered by the Court in the same case on a state of facts not different in legal effect." There is, as is said in *Stacy* v. *Vermont Central R. R. Co.*, 32 Vt. 551, 552, force in the argument that if there is error in the decision, and it is ever to be

reversed, it should be done in the same court; but however sound this may be in theory, as applicable to a single case, the result would be mischievous because if all such questions are to be regarded as still open for discussion and revision in the same cause, there would be no end to the litigation until the ability of the parties or the ingenuity of their counsel were exhausted. The rule has been applied where a motion for a directed verdict, previously decided, was again argued upon substantially the same evidence, on exceptions from a second trial. (*Bradley* v. *Blandin*, 94 Vt. 243, 253, 110 Atl. 309; *Barclay* v. *Wetmore & Morse Granite Co., supra; Guilmont's Admr.* v. *Central Vermont Ry. Co., supra; Dailey* v. *Swift & Co.*, 90 Vt. 69, 73, 96 Atl. 603; *Stacy* v. *Vermont Central R. R. Co., supra; Childs* v. *Millville Mut. M. & F. Ins. Co.*, 56 Vt. 609, 611) ; where the previous decision was to the effect that the plaintiff was not a trespasser (*Ingram's Admx.* v. *Rutland R. R. Co.*, 89 Vt. 278, 281, 95 Atl. 544, Ann. Cas. 1918A, 1191); that a chattel mortgage was valid (*Sherman* v. *Estey Organ Co.*, 69 Vt. 355, 356, 38 Atl. 70); that in determining the rental value of certain premises, the expense of insurance was properly chargeable against the income (*Citizens Savings Bank & Trust Co.* v. *Fitchburg Mut. Fire Ins. Co.*, 87 Vt. 23, 27, 86 Atl. 1056); that the evidence of actual damage was sufficient to go to the jury (*Capital Garage Co.* v. *Powell*, 99 Vt. 244, 248, 131 Atl. 10); that a tenancy at will had ripened into a tenancy from year to year (*Amsden* v. *Atwood*, 68 Vt. 322, 333, 35 Atl. 311); that a certain provision in an insurance policy had been waived by the insurer (*Mellen* v. *U. S. Health, etc., Ins. Co.*, 85 Vt. 305, 307, 82 Atl. 4); that the incompetency of a witness had been waived, so that his status had been established (*Comstock's Admr.* v. *Jacobs*, 89 Vt. 133, 137, 94 Atl. 497, Ann. Cas. 1918A, 465); that a certain judgment was not, upon the record, an estoppel. (*St. Johnsbury & L. C. R. R. Co.* v. *Hunt*, 59 Vt. 294, 299, 7 Atl. 277); where certain requests for instructions, made upon a second trial, could not have been granted without disregarding the holding of the Supreme Court in the same case (*McKinley* v. *Drew*, 71 Vt. 138, 141, 41 Atl. 1039); and where an identical issue raised by an amended bill, or by cross-bill, filed after remand, had already been decided (*Dietrich* v. *Hutchinson*, 75 Vt. 389, 391, 56 Atl. 6; *Barker* v. *Belknap's Estate*, 39 Vt. 168, 176). The same principle applies where a decree of a probate

court has become final, because no appeal has been taken, and so is conclusive in all subsequent proceedings in the same estate. *Lyons, Exr.* v. *Field, Trustee et al.,* 106 Vt. 474, 175 Atl. 11, 13, and cases cited. The foregoing authorities illustrate the true import and meaning of the phrase ''law of the case.''

██ (2) (3) It has been said that a ruling of the trial court, or an instruction to the jury, without any exceptions having been taken, becomes the law of the case. *Twombly* v. *Piette,* 99 Vt. 499, 505, 134 Atl. 700; *Sharby* v. *Town of Fletcher,* 98 Vt. 273, 278, 127 Atl. 300; *Saliba* v. *New York Central R. R. Co.,* 101 Vt. 427, 440, 144 Atl. 194; *Shields et al.* v. *Ins. Co.,* 102 Vt. 224, 225, 147 Atl. 352. And that where it appears from the record that the trial below proceeded upon a certain theory, acquiesced in by court and counsel, the theory thus adopted whether right or wrong becomes the law of the case. *Gentes* v. *St. Peter,* 105 Vt. 103, 104, 163 Atl. 569; *Sharby* v. *Town of Fletcher, supra.* What is meant, under these circumstances, is not that the ruling so made, the instruction so given, or the theory so adopted, is binding upon the parties in a subsequent trial of the same case, but only that upon hearing in the. appellate court, no claim opposed to it, in point of law, will be entertained. See *Bagley* v. *Cooper,* 90 Vt. 576, 579, 99 Atl. 230. This is simply an application of the rule, so well understood, and so many times announced that citations of authority are unnecessary, that questions which have not been raised below will not be considered on review. There is, of course, no holding, or even intimation, that the proceedings in this respect, are free from error. The appellate court merely takes the situation as it finds it, and as the parties have been content that it should find it, so far as the particular trial is concerned. There is no actual decision of a question which settles the law in respect thereto for further action in the case. If the result is an affirmance, with remand, it is merely an adjudication that none of the claims or error which have been properly raised, although, perhaps, not specifically referred to in the opinion, are well founded; if a reversal, no such conclusion follows because ''it is impossible to foretell what shape the second trial may take or what questions may be presented. Hence the rule is that a judgment of reversal is not necessarily an adjudiction by the appellate court of any other than the questions in terms discussed and decided.'' *Mutual Life Ins. Co.* v. *Hill,* 193 U. S.

██

551, 553, 554, 48 L. ed. 788, 791, 792, 24 Sup. Ct. 538. To apply the phrase "law of the case" under these circumstances is not entirely accurate; to do so is to provide an example of the unfortunate tendency, in speaking of legal matters, to make one term do double duty by employing it to describe two dissimilar conceptions. It would be more precise to say that it is the "law of the trial." In future proceedings in the same case, neither party is normally prevented, within the limits set by the issues presented by the pleadings, from insisting upon any theory or view of the law, which has not been decided by the Supreme Court as applicable to the cause, whatever rulings in the previous trial may have been permitted to pass unchallenged.

We spend no time in determining upon what theory this case was in fact tried below since it is not necessary to our decision that we should adopt either view; and since the question of the burden of proof is not necessarily involved in any of the exceptions briefed or argued, it is beyond the scope of this opinion, and so we do not consider it.

*Judgment reversed, and cause remanded.*

NOTE: When this cause was first argued, at the October Term, 1933, it was assigned to Mr. Justice Graham. After his decease, and at the February Term, 1934, it was reassigned to Mr. Justice Moulton.