FRANCIS FRIOT *v.* LESTER E. JORDAN.

January Term, 1945.

Present: MOULTON, C. J., SHERBURNE, BUTTLES, STURTEVANT and JEFFORDS, JJ.

Opinion filed February 6, 1945.

*McNamara & Larrow* for the defendant.

*H. J. Holden* for the plaintiff.

MOULTON, C. J. The issue before us is whether the record discloses evidence, which, taken most favorably for the plaintiff, fairly and reasonably tends to show that the automobile that struck and severely injured the plaintiff was the one owned and driven by the defendant. The latter, while admitting that there is some evidence which supports the plaintiff's claim, argues that the countervailing evidence preponderates over it to such a degree that it would have been an abuse of the trial court's discretion to refuse to set aside the verdict, and therefore that his motion for a directed verdict should have been granted, under the rule stated in *Wellman, Admr.* v. *Wales,* 98 Vt 437, 448, 129 A 317, and *Widham* v. *Town of Brattleboro,* 105 Vt 210, 214, 166 A 22.

The accident happened some minutes after noon on December 17, 1942, at the end of the guard rail on the northerly approach to the steel bridge over the Mississquoi River on the highway leading

southerly from Highgate Center to Highgate Springs. It was a very cold day, the temperature, according to the testimony, being 20 to 24 degrees below zero. The plaintiff, who was 68 years old, was walking from Highgate Center to his house in Highgate Springs. His eyesight was defective and he was the recipient of State aid, as a blind person, under the provisions of No. 12, Acts Special Session 1935, as amended by No. 107, Acts 1941, but the extent of his failure of vision at the time did not otherwise appear, except in that he said that he was able to do wood chopping, haying and gardening. He testified that when he reached the guard rail and was about to enter the bridge he saw a "black shiny car" coming out of a side road south of the bridge known as the Power House road; that he stopped, standing close to the rail on his right hand, and looked back to see if a car was on the road behind him; that while his head was turned he was hit by a car coming from the south across the bridge which he did not hear approaching; that the automobile stopped, after striking him, about 70 feet away, and the driver opened the front door and, standing on the running board, looked at him; that he called out, asking to be taken to the hospital, but that the driver said nothing, re-entered the car and went on; and that he recognized the driver as the defendant. Although the defendant drove out of the Power House road shortly after twelve o'clock on the day in question and passed over the highway leading to Highgate Center, he denied seeing or running into the plaintiff or stopping his car during his journey.

It is claimed that the identification of the defendant by the plaintiff is open to such doubt and is so discredited by other testimony that it cannot be a reasonable basis for a finding by the jury. It is urged that the plaintiff's impaired vision made his recognition completely unreliable. Attention is also called to his testimony that the driver was dressed in dark clothes, that the door of the car swung open from the rear and that the driver looked back over the top of the door, whereas the defendant's evidence was to the effect that he was wearing a light colored overcoat and that the door swung toward the front, so that if opened a person standing on the running board could not look back over the top of it. Furthermore, Homer Lambert who drove the plaintiff to the St. Albans hospital testified that he said that the car was gray in color, and he did mention the defendant as being the driver. Chief Motor Vehicle Inspector Alexander interviewed the plaintiff at the hospital dur-

ing the same afternoon and testified that he said that the car was blue, and that he thought it was driven by a woman, perhaps the wife of one of his neighbors. Inspector Malloy visited the hospital three or four days later, and testified that the plaintiff repeated what he had said to Alexander.

Improbable as the plaintiff's testimony as to his recognition may seem to be, despite his faulty vision it cannot be said to be impossible, and, especially when taken in connection with the other evidence in the case, without some probative force. *Parker* v. *Smith,* 100 Vt 130, 134, 135 A 495. The conflicts in the evidence as to the color of the driver's clothing and the manner in which the car door opened presented questions of fact, as all evidentiary contradictions do, and were to be weighed by the jury. *Perkins* v. *Vermont Hydro-Electric Co.,* 106 Vt 367, 399, 177 A 631. As to the claimed statements made by the plaintiff while on the way to the hospital, and to the Motor Vehicle officers while there, there was ample reason for the jury to distrust them, if made. Two other witnesses who also went with the plaintiff on the trip to the hospital testified that all he said was that he had been hit by an automobile and was very cold. They heard no reference to a gray car, although one of them was supporting him on the back seat. It would be reasonable for the jury to recall the evidence that he had been lying beside the road with a badly broken leg, in the sub-zero temperature for approximately half an hour before help had come, and to take what he may have said as the result of confusion of mind due to his suffering and exposure. Chief Inspector Alexander questioned him within an hour after his arrival at the hospital. He was, according to the attending physician, in a condition of severe shock and pain, and morphine had been administered. When the Chief Inspector came to his bedside he was packed in hot water bottles. The jury could reasonably weigh his statement in the light of his physical condition and the drug he had taken. And, although Inspector Malloy's visit was three or four days later, it might well be assumed that he was in essentially the same plight as before. His testimony, therefore, was not so completely discredited as the defendant claims. Its weight was for the jury to assess.

The defendant also contends that the evidence overwhelmingly shows that he had passed the place of the accident before the plaintiff reached it. The evidence on behalf of the plaintiff tended to

show that he left the office of the town clerk in Highgate Center a little before noon, and went to Tremblay's store, which is 230 feet in a direct line, although a little longer if one follows the road, from the office. At the store he picked up some packages that he had previously left there and walked down the steep grade toward the bridge, which is approximately one third of a mile away. As he passed Henry Banyea's garage the latter came out and walked with him a distance of 122 feet to the Banyea house, which is 338 feet northerly from the end of the guard rail. The plaintiff went on, covering the remaining distance in a little over a minute. A witness, Philip Copeland, who lives almost directly across the road from the garage, saw Banyea and the plaintiff together shortly after twelve o'clock, and placed the time as approximately two or three minutes after he had commenced to listen to the noon news broadcast. Next he heard someone calling and went out but heard nothing more. After that he saw a black automobile, which he identified as the one owned by the defendant, going up the hill from the bridge toward Highgate Center.

The defendant testified that he left the power house two or three minutes after twelve. He warmed the engine of his car, which had been standing in the cold for about two hours, and drove up grade along the Power House road to the highway, turned northerly, crossed the bridge and proceeded to his home, five miles away, arriving there at about 12:15. His usual time for the trip, which he often made, was twelve to fifteen minutes. It appeared that the distance from the power house to the highway is between 400 and 500 feet, and the distance from the junction of this road and the highway to the place where the plaintiff was injured is 420 feet. Henry Banyea was called as a witness by the defendant, and testified that he left his garage a little before noon by his watch, stopped a few minutes in the attached shed and then came out as the plaintiff was passing. When the witness entered his dwelling the house clock gave the time as 15 to 20 minutes after twelve. He was, he said, late for his midday meal, and Mrs. Banyea, after the immemorial custom of wives under such circumstances, emphatically called his attention to the fact. But he testified that the clock was sometimes kept fast so that he would not be late in going to his work, and he could not say whether he compared his watch with it on that occasion. Another of the defendant's witnesses, Corliss Greenia, who lives almost opposite the Banyea house

and 363 feet from the guard rail, testified that he left his work at the foundry in Highgate Center at noon by the foundry clock and on his way home met the defendant in his car not far from the fork in the road near the village. He placed the time of this meeting as three or four minutes after twelve. He stated, however, that the foundry clock varied, and qualified the time that he met the defendant by saying "if the clock was right". He also testified that while he was eating his lunch he heard a car go by, but he could not tell in what direction, and when he left to return to work, at about 12:30, he heard someone calling at the bridge. He saw a man leaning against the guard rail and reported the fact at the village. On cross examination, he said that, some days later, the defendant spoke to him about the accident, and denied being in Highgate on that day, and that he informed the defendant that he had seen him there.

If, as the defendant claims, the witness Greenia saw him driving toward Highgate Center between Greenia's house and the village at three or four minutes past twelve, and the witness Banyea parted from the plaintiff at fifteen to twenty minutes past twelve, at a point 338 feet away from the scene of the accident, it is certain that it was not the defendant's automobile that caused the injury. But these witnesses identified the times they gave by reference to clocks whose accuracy is not free from suspicion. The Town Clerk corroborated the plaintiff as to the time the latter left his office. By the witness Copeland's testimony the plaintiff and Banyea were together in front of the garage a very few minutes after twelve, and the defendant's automobile passed, going toward the village, not long after that. His identification of the time, by reference to the noon broadcast, might well be taken to be quite as reliable as that given by either Greenia or Banyea in reliance upon the clocks upon which they based their testimony, and roughly corresponds to the time of the plaintiff's departure from Highgate Center village, according to the town clerk and the plaintiff, allowing for the distance covered by the latter in the interim. Indeed, all the testimony as to time must be regarded as merely approximate, as is usually the case when witnesses seek to remember the moment when an event, of the significance of which they had no forewarning, took place. It is argued that Copeland testified differently on a previous trial of this case, but his credibility was for the jury to determine. And Greenia's account of the defendant's denial that he had been

in Highgate on the day in issue, if believed, might be considered by the jury as an attempt to conceal a participation in the accident and to be impeaching in nature.

Thus it appears that there was evidence fairly and reasonably tending to support the verdict, and it cannot be said that the countervailing evidence so preponderates that an abuse of discretion would appear in the denial of a motion to set the verdict aside as being against the weight of the evidence. We perceive no reason for disturbing the result of the trial.

*Judgment affirmed.*